**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GERARD NGUEDI, <br><br> *Plaintiff*, <br><br> v. <br><br> GENERAL DYNAMICS INFORMATION TECHNOLOGY, <br><br> *Defendant*. | Civil Action No. 23-2965 (RDM) |

**MEMORANDUM OPINION**

*Pro se* Plaintiff Gerard Nguedi brings this action against his former employer, General Dynamics Information Technology ("GDIT"), asserting, among other things, claims of race-based pay discrimination, retaliation, and breach of contract.  Before the Court are four motions: Plaintiff's Motion for Reconsideration and Leave to Amend, *see* Dkt. 74, the Motion of the Administrative Office of the U.S. Courts ("AO") for Relief from Further Vexatious Filings, *see* Dkt. 80, GDIT's Motion for Summary Judgment, *see* Dkt. 89, and Plaintiff's Motion for Leave to File a Supplemental Brief in Support of his Motion for Reconsideration and Leave to Amend, *see* Dkt. 92.  For the following reasons, the Court will **GRANT** GDIT's Motion for Summary Judgment, **DENY** Plaintiff's Motion for Reconsideration and Leave to Amend, **DENY** Plaintiff's Motion for Leave to File a Supplemental Brief, and **DENY** the AO's Motion for Relief from Further Vexatious Filings and GDIT's related request.

**I. BACKGROUND**

**A.    Factual Background**

For purposes of resolving GDIT's motion for summary judgment, the Court reviews "the facts in the record and all reasonable inferences derived therefrom in a light most favorable to"

the nonmoving party. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (citation modified). Here, the nonmoving party is Plaintiff. The difficulty is that, in opposing GDIT's motion for summary judgment, Plaintiff only partially complied with Local Civil Rule 7(h)(1)'s requirement that his statement of disputed material facts include "references to the parts of the record relied on to support [each] statement" "as to which [he] contend[s] there exists a genuine issue necessary to be litigated." Plaintiff "denied" almost every fact in Defendant's Statement of Undisputed Material Facts, and most of his responses are argumentative—they characterize statements as "misleading," "incomplete," "conclusory" or "omit[ting] critical context"—rather than identifying actual factual disputes or referencing evidence controverting the stated proposition. *See generally* Dkt. 91 at 19–63. Where he does cite to evidence, moreover, his evidence is often unresponsive to the facts posited in Defendant's Statement of Undisputed Material Facts. The Court cautioned Plaintiff that "it will accept as true any factual assertion supported by the affidavits (or declarations) or other documentary evidence submitted with the motion" and that "[i]t is not enough just to state that the other side's affidavits or other evidence are inaccurate or incorrect." Dkt. 90 at 1–2.

The Court will, accordingly, highlight factual disputes where Plaintiff supplies evidence or where such evidence can readily be discerned from the record. To the extent a factual assertion is properly supported in Defendant's Statement of Undisputed Material Facts and is not properly controverted with a citation to relevant evidence in Plaintiff's response, however, the Court will treat the fact as uncontested. Against this backdrop, the relevant facts are as follows:

GDIT is "a non-governmental company that provides information technology, systems engineering, and professional services to customers in the defense, intelligence, homeland security, federal civilian government, and commercial sectors." Dkt. 89-1 at 1 (Def.'s SUMF

¶ 1).  Plaintiff is a Black man from Cameroon.  Dkt. 89-3 at 318; *Nguedi v. Fed. Rsrv. Bank of N.Y.*, No. 1:16-cv-636, 2019 WL 1083966, at *2 (S.D.N.Y. Mar. 7, 2019), *aff'd*, 813 F. App'x 616 (2d Cir. 2020).  On December 16, 2022, GDIT offered Plaintiff a job as a Scrum Master Advisor, reporting to Bob Basinger, a Program Director at GDIT.[1]  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 5); Dkt. 89-3 at 320–22; Dkt. 89-4 at 1 (Basinger Decl. ¶ 2).  Plaintiff's offer letter states that his salary would be $140,000 pre-tax and deductions.  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 6); Dkt. 89-3 at 320.  It furthermore states that his "employment with the company is 'at-will' and that the company does not guarantee [his] employment for any specific period of time."  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 8); Dkt. 89-3 at 321.  It continues:  "[T]here is no written or unwritten agreement of employment between you and the company.  Both you and the company have the choice of ending your employment at any time, for any reason, with or without notice."  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 7); Dkt. 89-3 at 321.  Plaintiff accepted the offer electronically the same day.  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 9); Dkt. 89-3 at 323.  He began working for GDIT on January 30, 2023.  Dkt. 89-1 at 2 (Def.'s SUMF ¶ 11); Dkt. 91 at 25 (Pl.'s Resp. to Def.'s SUMF ¶ 11).  The Scrum Master Advisor position was the only position that Plaintiff held while employed at GDIT.  Dkt. 89-1 at 3 (Def.'s SUMF ¶ 16).  GDIT does not administer or control employee security clearances.  *Id.* (Def.'s SUMF ¶¶ 18–19).

There is no dispute that a central feature of Plaintiff's job responsibilities was supporting the Judiciary Space Management ("JSPACE") project on "Task Order 1" of GDIT's contract with the AO or that Plaintiff was the only Scrum Master Advisor assigned to the JSPACE project on Task Order 1.  *See id.* at 3 (Def.'s SUMF ¶¶ 12–13); Dkt. 91 at 25–26 (Pl.'s Resp. to Def.'s

---

[1] A "scrum" is "an agile team collaboration framework commonly used in software development and other industries," and a "scrum master" facilitates the scrum.  *See Scrum (project management)*, Wikipedia, https://perma.cc/YM9Z-R9C3.

SUMF ¶¶ 12–13).  There is some dispute regarding whether Plaintiff was also hired to support

other task orders, specifically Task Orders 6 and 11, *compare* Dkt. 89-4 at 2 (Basinger Decl.

¶ 10) (noting that Plaintiff was "not the lead for any other task orders," and any support he

provided "was solely for coordination purposes, consistency of reporting on the monthly status

report, and oversight of his direct reports who were split across various task orders" (citation

modified)), *with* Dkt. 91-1 at 32 (Basinger onboarding email identifying "[Task Orders] 1, 6, and

11" as part of Plaintiff's "Roles and Responsibilities").

Plaintiff had some onboarding troubles.  Under GDIT policy, new employees have 31

days after their hire date to enroll in benefits, and employees receive this information at the time

of hiring, during orientation, and after their start date.  Dkt. 89-2 at 2 (Birnbaum Decl. ¶ 11).

Plaintiff did not enroll within the 31-day period, which resulted in his placement in the default

medical plan.  *Id.* at 2–3 (Birnbaum Decl. ¶ 12).  He submitted a ServiceDesk ticket to GDIT and

to Fidelity, GDIT's benefits administrator, on March 7, 2023, asking about benefits enrollment.

*Id.*  Although he was past his eligibility period, Fidelity opened an enrollment action and

Plaintiff was able to update his benefits elections retroactive to his start date.  *Id.*  Plaintiff does

not dispute any of these facts, or that the issue was resolved, *see* Dkt. 89-3 at 39 (Nguedi Dep.

39:12–24), other than merely asserting, with no citation to the record, that he was unaware of

how to choose his healthcare options and that he was not informed about the enrollment process,

*see generally* Dkt. 91 at 29–30 (Pl.'s Resp. to Def.'s SUMF ¶¶ 20–23).

Plaintiff also had some issues with his onboarding paperwork in April.  A GDIT Human

Resources ("HR") employee, Yanci Gonzalez, reached out to him on April 5, 2023, asking him

to resend the picture and barcode pages of his passport to complete closing out his I-9 form.  Dkt.

91-1 at 11–13.  Plaintiff responded that he had already provided this information and asked

Gonzalez to "process the same information again." *Id.* at 14. Another GDIT employee clarified

that HR needed the passport pages because the person who "verified [Plaintiff's] documents"

mistakenly used different identification documents for two different sections of the form. *Id.*

Gonzalez followed up once more. *Id.* at 15. The record does not indicate whether Plaintiff

responded.

Plaintiff's claims arise from a series of events that occurred in July 2023. First, Plaintiff

testified that "from Day One," he informed Basinger that he "needed a salary adjustment"[2] and

that Basinger told him that they would talk about it in a year based on his performance. *See* Dkt.

89-3 at 29 (Nguedi Dep. 29:18–23). Plaintiff responded that "it's not about a salary adjustment

based on inflation or something like that. It's that I am in the wrong category or something." *Id.*

at 29–30 (Nguedi Dep. 29:24–30:2). Basinger, in contrast, attests that Plaintiff's only salary

adjustment request came during a meeting on July 5, 2023. Dkt. 89-4 at 2 (Basinger Decl. ¶ 14).

Here too, a factual dispute emerges about when this meeting occurred. Basinger attests that the

meeting occurred on July 5, and, for support, GDIT provides a screenshot of the Microsoft

Teams invite set for that date. *Id.* at 10. Plaintiff does not remember a meeting on July 5, 2023,

and appears to concede that a meeting may have occurred that day, but he insists that the relevant

meeting at which he requested a salary adjustment occurred on July 11, 2023. *See* Dkt. 91 at 31,

39 (Pl.'s Resp. to Def.'s SUMF ¶¶ 25–26, 37). Because Plaintiff testified to this effect during his

deposition, *see* Dkt. 89-3 at 44 (Nguedi Dep. 44:15–17), and thus controverted GDIT's evidence

---

[2] Plaintiff vigorously contends that he asked for a "salary adjustment" and not a raise or a merit-based increase. *See, e.g.*, Dkt. 91 at 30–31, 39 (Pl.'s Resp. to Def.'s SUMF ¶¶ 24–26, 37). Although the Court is unable to discern the practical difference between the two, it will use "salary adjustment," the term preferred by Plaintiff, because there is no material or genuine factual dispute that Plaintiff sought to be paid more.

with sworn testimony, the Court will treat the exact date as disputed and, for ease of reference, will refer to the meeting as the "July 2023 meeting."

During that meeting, Basinger informed Plaintiff that he was not eligible for a pay increase at that time but that he would become eligible for a raise in March of 2024, which would be based on his performance in 2023. Dkt. 89-4 at 2–3 (Basinger Decl. ¶¶ 12, 14); Dkt. 89-3 at 188 (Nguedi Dep. 188:6–10). Plaintiff did not mention his or anyone's race or any alleged discrimination during that meeting, and Basinger did not discuss Plaintiff's request with anyone from the AO, since "the AO is not responsible for setting salaries for GDIT employees." Dkt. 89-1 at 5 (Def.'s SUMF ¶ 30); Dkt. 89-4 at 3–4 (Basinger Decl. ¶ 14).

On July 13, 2023, Basinger received an email from Troy Pomroy, an AO Branch Chief, informing Basinger that Pomroy had "determined the JSPACE team no longer required a full-time scrum master" and that Pomroy "wanted to transition Plaintiff off the contract and backfill his position with a business analyst." Dkt. 89-1 at 5 (Def.'s SUMF ¶ 34); Dkt. 89-4 at 11 (July 13 email). In that email, Pomroy also indicated that he wanted the business analyst to shadow another employee and to take on "new upcoming work" and that he wanted a "two[-]week transition" of some of Plaintiff's "day to day" responsibilities to other employees. Dkt. 89-4 at 11.

In light of this request, Basinger notified Plaintiff on July 19, 2023, "that he would be laid off effective August 4, 2023," unless Plaintiff was able to "secure alternate employment within GDIT." Dkt. 89-1 at 5 (Def.'s SUMF ¶ 35); Dkt. 89-4 at 12 (Plaintiff's layoff letter); Dkt. 89-2 at 17 (Basinger email to Plaintiff). Basinger and one of GDIT's Human Resources Business Partners, Maureen Birnbaum, met with Plaintiff that same day regarding the layoff. Dkt. 89-2 at 3 (Birnbaum Decl. ¶ 13). Following the meeting, Birnbaum encouraged Plaintiff to

6

use GDIT's "internal mobility" resources to find another position within GDIT, *id.* (Birnbaum Decl. ¶ 14), and provided information regarding an Employee Assistance Program, *id.* at 16 (Birnbaum email to Plaintiff).  Plaintiff separately inquired about severance packages.  *Id.* at 19. Birnbaum again encouraged Plaintiff to make use of the internal mobility resources.  *Id.* at 18. Plaintiff informed Birnbaum and Basinger that he would "probably not be interested in internal mobility."  *Id.*; Dkt. 91 at 40 (Pl.'s Resp. to Def.'s SUMF ¶ 38).

On July 20, 2023, Plaintiff sent two emails—one to three AO employees, and the other to Basinger and Pomroy—in which he claimed, among other things, that two tabs on one of his electronic files had disappeared; that he believed that there was "some deep level of hacking . . . at play" by the Federal Reserve; that he was "being sabotaged and targeted;" that "Edward Snowden was telling the truth;" that one of the AO employees had said during a meeting that Plaintiff's work would guide the team going forward, which he believed was inconsistent with what GDIT told him when laying him off; that he believed he was being targeted "because of [his] race;" that "shady forces connected to the fake jew and the fake federal reserve [were] trying to take control of the judiciary to use it against black people;" and that he was the "Second Coming of Jesus Christ."  Dkt. 89-3 at 331–32.  The Court includes screenshots of the two emails below.

| From: | Gerard Nguedi <Gerard_Nguedi@ao.uscourts.gov> |
|-------|----------------------------------------------|
| Sent: | Thursday, July 20, 2023 1:54 PM |
| To: | Christopher        Ann        Keira |
| Subject: | Targeted |
| Attachments: | Copy of Copy of JFACTS VS JSPACE MODULES BY 2025_Error file one.csv; Copy of Copy of JFACTS VS JSPACE MODULES BY 2025_.csv |

Hi Chris, Hi Ann, Hi Keira,

I think I'm being targeted and sabotaged. After the backlog grooming meeting just a few minutes ago, I was prompted to restart my computer and when it came back the Gap Analysis spreadsheet I shared with the team this afternoon was missing the same two tabs that you were missing, the two tabs where most of the information reside.

This to me is an indication that some deep level of hacking is at play, the environment is not safe, if they can do this to my emails and files, they can do this to anyone in the Judiciary. Imagine that for a second, to the point they can delete tabs into a file on my computer without me knowing? Just to make me look bad in the eyes of the client, what else have they done? Pulling strings behind the scene, the Federal Reserve is sabotaging me everyday, they put me in jail for a crime that never took place and now these tabs going missing? This is something that I personally know only the fake federal reserve can do,because of my past suing them all the way to the Supreme Court, now they target me everywhere I go, even at the Judiciary. I'm used to their technics now, I have been dealing with this for quite a while now but I have never seen this level of infiltration in my life. Edward Snowden was telling the truth, we do not have privacy even at work. Please see attached files I have now, the second one is the one I showed you just a few minutes ago, the info is no longer there and mixed up from different tabs.

Chris, I think you ended the grooming by saying "this is going to help guide us going forward", but yet yesterday GDIT told me I was let go because "the client wants to move in a different direction" which seems 100% inconsistent with your statement in the backlog meeting today, please do not get manipulated.

I'm really confused and would like to know if there was any misunderstanding, maybe it was because of the missing tabs? It's making me freakout as well, but I do enjoy this initiative, so if this happened because of a misunderstanding or manipulation from some shady forces trying to take control of the judiciary to use it against black people, like they did to me from 2015 to 2022. That's what I don't want to happen to other people,

FYI: I'm the Second Coming of Christ.

Thank you,

Gerard Nguedi
Scrum Master Advisor
General Dynamics Information Technology
Administrative Office of the United States Courts
Cell: (646) 744-7802

**EXHIBIT**

13

Nguedi v. GDIT
GDIT-000229

*Id.* at 331.

| From: | Gerard Nguedi <Gerard_Nguedi@ao.uscourts.gov> |
| Sent: | Thursday, July 20, 2023 3:32 PM |
| To: | Troy Pomroy; Bob Basinger |
| Subject: | Meeting Recording |
| Attachments: | Copy of Copy of JFACTS VS JSPACE MODULES BY 2025_Error file one.csv; Copy of Copy of JFACTS VS JSPACE MODULES BY 2025_.csv |

Hi Troy, Hi Bob,

Sorry I had the time of the meeting mixed up, I said 3PM when in fact it was at 1PM. I usually don't record this meeting but I recorded it this time and here is the recording, please let me know if you have any questions/comments.

As you will see, I sent a file that miraculously turnout to miss the two key tabs in it, making Christ, Ann and Keira believe I wasn't doing anything but that was corrected during the meeting.

JSPACE Backlog Grooming-20230720_130450-Meeting Recording.mp4 (sharepoint.com)

As you will see in the video there were that's that miraculously disappeared on the file I sent to the team as I told Rob earlier, I think I'm being sabotaged and targeted. After this backlog grooming meeting, I was prompted to restart my computer and when it came back the Gap Analysis spreadsheet I shared with the team in this video was missing the same two tabs that were missing in the file Chris, Ann and Keira saw, the two tabs where most of the information resides.

This to me is an indication that some deep level of hacking is at play, the environment is not safe, if they can do this to my emails and files, they can do this to anyone in the Judiciary. Imagine that for a second, to the point they can delete tabs into a file on my computer without me knowing? Just to make me look bad in the eyes of the client, what else have they done? Pulling strings behind the scene, the Federal Reserve is sabotaging me everyday, they put me in jail for a crime that never took place and now these tabs going missing? This is something that I personally know only the fake federal reserve can do,because of my past suing them all the way to the Supreme Court, now they target me everywhere I go, even at the Judiciary. I'm used to their technics now, I have been dealing with this for quite a while now but I have never seen this level of infiltration in my life. Edward Snowden was telling the truth, we do not have privacy even at work. Please see attached files I have now, the second one is the one in the video but the info is no longer there and mixed up from different tabs.

Also, as you can see in the video Chris Smith ended the meeting saying "this is going to help guide us going forward", but yet yesterday GDIT told me I was let go because "the client wants to move in a different direction" which is 100% inconsistent with what you can see in this video, this is why I believe that I'm being targeted because of my race. Some shady forces connected to the fake jew and the fake federal reserve are trying to take control of the judiciary to use it against black people, like Bill Bratton and the fake federal reserve did to me from 2015 to 2022.

FYI: I'm the Second Coming of Jesus Christ.

Thank you,

Gerard Nguedi
Scrum Master Advisor

**EXHIBIT**

14

Nguedi v. GDIT

*Id.* at 332.

Following these emails, Pomroy asked Basinger to remove Plaintiff from the program immediately, rather than allowing him to work through August 4, 2023.  Dkt. 89-1 at 6–7 (Def.'s

SUMF ¶ 40); Dkt. 89-4 at 4 (Basinger Decl. ¶ 20).  Contemporaneous HR documentation of the incident shows that Birnbaum spoke to Basinger, who denied any knowledge of Plaintiff's files being manipulated and sabotaged and thought these claims were "crazy talk," but also said that he was not comfortable speaking with Plaintiff further out of concern that this was a potential legal situation better handled by HR.  Dkt. 74-1 at 34; Dkt. 89-4 at 4 (Basinger Decl. ¶ 21).  Birnbaum called Plaintiff that afternoon to inform him that he was being placed on administrative leave, effective July 21, 2023, with pay until August 4, 2023, due to the AO's request to remove him.  Dkt. 89-1 at 7 (Def.'s SUMF ¶ 42); Dkt. 89-2 at 3 (Birnbaum Decl. ¶ 16).  GDIT also reached out to its security department to put an alert on Plaintiff's account. Dkt. 74-1 at 34.

During the phone call with Birnbaum, "Plaintiff expressed confusion about why the customer would request his removal and suggested it was related to his race" and complained that his direct reports received higher salaries than him.  Dkt. 89-1 at 8 (Def.'s SUMF ¶ 47). This was the first time Plaintiff raised concerns about discrimination.  *Id.* (Def.'s SUMF ¶ 48); Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 18);  Dkt. 74-1 at 34 (H.R. documentation noting Plaintiff's claim of discrimination raised during call with Birnbaum).  Birnbaum informed him that she could open a case for him with GDIT's Employee Relations team to investigate and address his concerns.  Dkt. 89-1 at 8 (Def.'s SUMF ¶ 49); Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 18).  Among other things, Plaintiff responded that he did not "think it's necessary to open a case because [he was] planning on filing a lawsuit."  Dkt. 89-2 at 20.  He further asserted:  "THIS SYSTEMIC RACISM IS NOT A JOKE.  Stop harassing black people, white supremacy does not exist, stop harassing black people;" "Even my healthcare and dental insurance were sabotaged at first, this is just criminal, a level of harassment on all black people all over the world, this just needs to go

to court;" and "I was being targeted because of my race by white zombies who think black people are here to be like them and become jealous because I'm performing better than white people." *Id.* (emphases in original).

Pursuant to its own policies, GDIT nevertheless proceeded to investigate Plaintiff's complaints. Dkt. 89-1 at 8 (Def.'s SUMF ¶ 50); Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 19). GDIT undertook a salary comparison between Plaintiff and his subordinates and his peers. Dkt. 89-1 at 8–9 (Def.'s SUMF ¶¶ 51–55); Dkt. 89-2 at 4–5 (Birnbaum Decl. ¶¶ 20–21). A GDIT Employee Relations employee, Kenisha Smallwood, also attempted to speak to Plaintiff on July 26, 2023. *See generally* Dkt. 89-5 at 1–10 (certified meeting transcript). Plaintiff was "not interested in talking too much," *id.* at 1, asked Smallwood to read the email he sent to Birnbaum out loud to him, *id.* at 3–5, and asked Smallwood to not "call again," *id.* at 7. He said that information about his allegedly discriminatory treatment was "in the emails" but did not provide further specific information, names of those who discriminated against him, or examples of discriminatory incidents. *See generally id.* at 1–10. Smallwood interviewed other individuals who managed Plaintiff or who processed his layoff and eventual termination and concluded that his allegations of racial discrimination were unsubstantiated. Dkt. 89-2 at 5 (Birnbaum Decl. ¶¶ 24–25).

Plaintiff's employment terminated after he did not find another role at GDIT through internal mobility during his administrative leave. Dkt. 89-1 at 7 (Def.'s SUMF ¶ 44); Dkt. 89-2 at 3 (Birnbaum Decl. ¶ 17). His role as Scrum Master Advisor on Task Order 1 was not filled after his termination. Dkt. 89-1 at 7 (Def.'s SUMF ¶ 45); Dkt. 89-4 at 4 (Basinger Decl. ¶ 24). Basinger opened a requisition for a business analyst on August 1, 2023, and that role was filled on October 10, 2023. Dkt. 89-1 at 8 (Def.'s SUMF ¶ 46); Dkt. 89-4 at 5 (Basinger Decl. ¶ 25).

11

Plaintiff did not apply for that position.  Dkt. 89-1 at 8 (Def.'s SUMF ¶ 46); Dkt. 89-4 at 5 (Basinger Decl. ¶ 25).

In an email sent on the evening of July 20, 2023, Birnbaum informed Plaintiff that his paid administrative leave would "continue until August 4[th] as per" the layoff notification and that Birnbaum would "complete all the timesheets for processing."  Dkt. 89-2 at 35.  On September 7, 2023, Plaintiff inquired with Birnbaum about his last paycheck and noted that he had not received payment for his unused vacation time.  *Id.* at 32.  The following day, Plaintiff sent another email reiterating that his last paycheck for $3,674.02 "didn't include leave payout." *Id.* at 30.  Birnbaum promptly responded that the $3,674.02 "was the final payment," which included "payment for regular hours, general leave and personal time/sick . . . minus taxes and deduction."  *Id.* at 29.  Plaintiff disputed this calculation, contending that he "worked 80 hours in the last two weeks" and had "additional 40 to 50[]hours of unused vacation;" that "[t]hese numbers are not correct" and did not "add up;" that the amount he was entitled to could not "equal just $3,674" since he was "already making that amount by weekly (sic);" and that "[o]ne big check [was] missing."  *Id.* at 29.  Plaintiff sent another email calling Birnbaum "crazy," and a "monster," and accusing her of "fighting to nickel and dime black people."  *Id.* at 27.  Birnbaum clarified that any misunderstanding might be because the "final check with GDIT was for one week of the two[-]week pay period," which began on July 31, 2023, and ended, for Plaintiff, on August 4, 2023.  *Id.* at 27–28.  Plaintiff accused Birnbaum of sending "fake numbers" that were "cooked up," stating that Birnbaum was "even lower than [he] thought."  *Id.* at 27.  Plaintiff further vowed to "take GDIT down with the fake federal reserve and the fake jew system," which he claimed GDIT had "tr[ied] to create to harass black people."  *Id.*  A paystub from Plaintiff's last paycheck confirms that he received a pretax "General Leave Payout" of

$3,596.25, along with regular pay of $2,678.85, and that his final payment was reduced to cover insurance, a 401k payment, taxes, and social security. *Id.* at 25–26.

## B.    Procedural History

On August 12, 2023, Plaintiff filed an initial inquiry or intake questionnaire with the Equal Employment Opportunity Commission ("EEOC"), reporting the July 11 salary adjustment request that was followed by the July 19 layoff, the purportedly inconsistent statements made by Basinger and an AO employee, and the "miraculous[] delet[ion]" of his work product. Dkt. 91-1 at 52. The questionnaire also states that he was unable to "set [his] own meetings under [his] name" or to "invite people to [his] own meetings directly," that his "documents submitted to HR miraculously disappeared," and that his "healthcare selection was imposed on [him]." *Id.* at 54. On October 2, 2023, Plaintiff initiated this action. *See* Dkt. 1 (Compl.).

> On December 10, 2023, Plaintiff filed a formal EEOC Charge which states:
>
> On July 11, 2023, I spoke with my manager regarding my salary after I determined employees who I managed [had] salaries [that] were significantly higher than myself. My manager stated he would speak with the client. On July 19, 2023, I was discharged, and my assignment was to end on August 4, 2023. The reason given for the discharge was the client was going in a different direction. I believe I have been discriminated and retaliated against because of my race (black), national origin (African), color (black) in violation of Title VII . . . with respect to wages and discharge.

Dkt. 89-3 at 318. Plaintiff received his Determination and Notice of Rights the next day. *Id.* at 319.

Because the Court's prior decisions in the matter are relevant to the pending reconsideration and leave to amend motions, *see Nguedi v. Admin. Off. of the U.S. Court* ("*Nguedi I*"), No. 23-cv-2965, 2024 WL 4957266 (D.D.C. Dec. 3, 2024), Order, *Nguedi v. Admin. Off. of the U.S. Court* ("*Nguedi II*"), No. 23-cv-2965, Dkt. 58 (D.D.C. May 9, 2025), and

13

Order, *Nguedi v. Admin. Off. of the U.S. Court* ("*Nguedi III*"), No. 23-cv-2965, Dkt. 71 (D.D.C. June 29, 2025), the Court describes the procedural history in some depth.

Plaintiff brought this action against both GDIT and the AO.  Dkt. 1 at 1–2 (Compl. ¶ 6). After Plaintiff filed this action, GDIT answered the complaint, *see* Dkt. 18, and the parties have since concluded discovery, *see* Min. Order (July 3, 2025).  The AO, however, moved to dismiss on multiple grounds, including Plaintiff's failure to effect service.  *See* Dkt. 17.  After providing an opportunity to effect service on the AO, *see* Dkt. 32, the Court considered the AO's renewed motion to dismiss on the remaining grounds, including lack of subject-matter jurisdiction and failure to state a claim, *see* Dkt. 35.  The Court granted that motion on December 3, 2024, concluding that "each of Plaintiff's claims against the [AO] fail[ed], either for lack of subject-matter jurisdiction or for failure to state a claim upon which relief may be granted."  *Nguedi I*, 2024 WL 4957266, at *4.  As relevant here, the Court dismissed Plaintiff's Title VII claims against the AO for two reasons: first, because "Plaintiff ha[d] not pled facts that, taken as true, would establish that the [AO] exercised sufficient control over him to cross the line from contractor to joint employee" such that it would be subject to Title VII liability, *id.* at *5; and second, because he had "fail[ed] to allege facts sufficient to support a Title VII claim against the [AO]," *id.* at *6.

Plaintiff filed his first motion for reconsideration on December 10, 2024, arguing that the Court erred in concluding that he had failed to allege facts sufficient to assert a Title VII claim against the AO based on a theory that it, along with GDIT, "jointly employed" Plaintiff, and he proffered evidence purportedly showing that he was a joint employee.  *See generally* Dkt. 47. The Court denied that motion, again, for two reasons.  First, it noted that the exhibits attached to Plaintiff's motion "further support[ed] the conclusion that [Plaintiff] was employed by [GDIT]

14

and not by the [AO]."  Min. Order (Dec. 27, 2024).  Second, the Court explained that "*even if [the AO] were considered his employer*," Plaintiff's conclusory assertion "of a conspiracy between GDIT and [the] AO to sabotage him due to his race," Dkt. 47 at 4, did not suffice to "allege facts that would support an inference that the [AO] . . . had taken any action that violated Title VII."  Min. Order (Dec. 27, 2024) (emphasis added).

Plaintiff filed a second motion for reconsideration on January 27, 2025.  *See* Dkt. 53. The Court denied that motion as well, "again conclud[ing] that Plaintiff's complaint does not allege facts sufficient to state a Title VII claim against the [AO]."  *Nguedi II*, Dkt. 58 at 3. Plaintiff's complaint "[did] not allege (or permit a reasonable inference) that the [AO], rather than [GDIT], set his starting salary," *id.* at 4–5, that "anyone from the [AO] told [GDIT] not to raise Plaintiff's salary," or "that the [AO] approved raises for [any] similarly situated contractors of a different race or did anything else that might support a *prima facie* [claim] of racial discrimination," *id.* at 5 (emphasis added).  Plaintiff's theory of retaliation based on being laid off after requesting a raise also failed because "[a] request for salary adjustment, which is not accompanied by an accusation or complaint of discrimination, does not constitute Title VII-protected activity," *id.* at 5, and the complaint did not allege that Plaintiff ever suggested—directly or indirectly—to the AO that he was denied a salary increase because of his race. Plaintiff also included a new theory of retaliation in this second motion for reconsideration, challenging the termination of his access to AO systems after he sent his July 20, 2023, emails. Dkt. 53 at 4, 7.  The Court declined to consider these allegations because they did not appear in Plaintiff's complaint.  *Nguedi II*, Dkt. 58 at 5–6.

Plaintiff then moved to amend his complaint to add those allegations—twice.  *See* Dkts. 59 & 68.  The Court denied both motions on June 29, 2025, *see Nguedi III*, Dkt. 71, because

15

"Plaintiff's amended complaint [did] not cure the deficiencies of his previous complaint with respect to his allegations against the [AO]," *id.* at 5.  The Court denied the motion on six separate grounds:

*First*, Plaintiff's proposed amended complaints did "not allege (or support a reasonable inference) that the [AO], rather than [GDIT], set his starting salary."  *Id.*

*Second*, his proposed amended complaints did not allege or support a reasonable inference "that the denial of his request for a raise was racially motivated," such as by identifying "similarly situated individuals who received raises after just six months at GDIT or while relatively new to an [AO] contract."  *Id.*

*Third*, his proposed amended complaints did not support an inference that "his request for a raise constituted—or was accompanied by any—[Title VII-protected] activity."  *Id.*

*Fourth*, Plaintiff's allegations failed to state a claim for a hostile work environment:  His allegations that he was "prevented from controlling his own meetings," made to "continue using meeting schedules set by his white predecessor," and "pressured . . . not to report two significant security breaches" did not surpass the "high hurdle" of "severe" and "pervasive" conditions required for a claim of hostile work environment.  *Id.* at 6 (alteration in original and citation modified).

*Fifth*, Plaintiff's new allegations of retaliation based on his technology access termination after he sent his July 20 emails "fail[ed] to support a plausible Title VII retaliation claim against the [AO]."  *Id.*  Plaintiff attached an image of the second July 20 email to his amended complaints.  Dkt. 59-1 at 15.  The Court concluded that not only were Plaintiff's "allegations of racially motivated hacking fantastical and facially implausible," *Nguedi III*, Dkt. 71 at 7, but also that Plaintiff's email did not constitute Title VII-protected activity because he did not

16

"communicate[] to [his] employer a belief that *the employer* ha[d] engaged in a form of employment discrimination," *id.* at 7–8 (emphasis added) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)), he only identified "the fake jew and the fake federal reserve" as the source of his discrimination, *id.* (citation modified).

*Finally*, independent of futility, the Court held that "permitting the amendment at this late date would cause GDIT substantial prejudice" and would cause "substantial delay" in the litigation as a whole. *Id.* at 8.

By this point, discovery had concluded as to GDIT, and GDIT had sought a pre-summary judgment motion conference. *See* Dkt. 69 (dated June 16, 2025). Following the conference, the Court set a summary judgment briefing schedule on July 3, 2025. Min. Order (July 3, 2025). The next day, Plaintiff filed a motion for reconsideration of the Court's denial of leave to amend and leave to file a third amended complaint. *See* Dkt. 74. Both GDIT and the AO opposed the motion, *see generally* Dkts. 76, 80, & 81, and both requested the Court to issue an order requiring Plaintiff to seek leave before filing any further motions attempting to amend his complaint or to reinstate claims against the AO, Dkt. 76 at 5; Dkt. 80 at 10–11. On September 1, 2025, after GDIT had filed its Motion for Summary Judgment, *see* Dkt. 89, Plaintiff filed a motion for leave to file a supplemental brief in support of his reconsideration and amendment motion, *see* Dkt. 92, which included materials from discovery with GDIT. The AO opposed the motion. *See* Dkt. 94.

The four motions—GDIT's Motion for Summary Judgment, Dkt. 89, Plaintiff's Motion for Reconsideration and Leave to Amend, Dkt. 74, Plaintiff's Motion to file a Supplemental Brief, Dkt. 92, the AO's Motion for Relief from Further Vexatious Filings, Dkt. 80, and GDIT's similar request—are now ripe for decision.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the outcome of the litigation. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the nonmoving party. *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The nonmoving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (citation modified). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

Finally, the Court notes that Plaintiff's filings contain multiple inaccurate or misleading citations, perhaps due to the use of artificial intelligence in researching the relevant law.[3] *See* July 14, 2025 Hrg. Tr. (Rough at 10) ("I only use AI on my computer to research all of these things."). The Court understands that Plaintiff is proceeding *pro se* and that legal research can be challenging even for trained lawyers. But the use of nonexistent quotations and misleading case citations "dramatically weakens" his submissions as he has failed "to cite to supporting authority." *Williams v. Cap. One Bank, N.A.*, No. 24-cv-2032, 2025 WL 843285, at *7 (D.D.C. Mar. 18, 2025). Consistent with Federal Rule of Civil Procedure 56(e)(3) and D.C. Circuit guidance, however, the Court has nonetheless considered the merits of GDIT's Motion for

---

[3] For example, Plaintiff claims that page 495 of *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008) contains the quote "[A]n employer that fails to explain or respond to a discrimination complaint may raise suspicion of unlawful intent." Dkt. 74 at 5 (alteration in original). But this quote appears nowhere in that decision, and the case does not involve a failure to respond to a discrimination complaint. In Plaintiff's opposition, he cites *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019) as containing the quote "Title VII is a remedial statute to be liberally construed in favor of complainants" and as supporting his arguments related to administrative exhaustion. Dkt. 91 at 5. But the case does not contain that quote and it makes no mention of Title VII administrative exhaustion at all. As another example, Plaintiff cites *Doe v. United States Postal Service*, 317 F.3d 339, 344 (D.C. Cir. 2003), as "holding that intentional torts 'do not fall within the scope of the [Workers' Compensation Act's] exclusivity provision' where they are not the type of risks inherent in the workplace." Dkt. 91 at 10. But that case also does not contain that quote, and indeed, says nothing about the Workers' Compensation Act or intentional torts whatsoever.

Plaintiff also frequently misstates the law. For example, Plaintiff cites *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977), for the proposition that "prejudice to defendants is not a valid ground to deny leave where amendment would correct critical defects in the original pleading." Dkt. 74 at 5. But the relevant portion of that case stands for the opposite proposition: The district court's denial of leave to amend on prejudice alone was not an abuse of discretion. *McMillan*, 566 F.2d at 720. Plaintiff also cites the case *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999), for the proposition that "Courts routinely grant leave even at later stages when the amendment serves justice and is not futile." Dkt. 74 at 6. But that case involved a district court's *denial* of leave to amend after dismissing a complaint at the motion-to-dismiss posture, not a "later stage," and the circuit explicitly did not review or reach the denial of leave to amend. *Richardson*, 193 F.3d at 546.

Summary Judgment, has not treated any legal issue as conceded, and has reached its own conclusions as to whether, as a matter of law, the entry of summary judgment is warranted. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506–07 (D.C. Cir. 2016).

### III. ANALYSIS

**A.    Summary Judgment**

1.    *Title VII, DCHRA, and Section 1981 Claims (Counts I, IV, V, VII)*

a.    <u>Administrative Exhaustion of Title VII Claims</u>

GDIT seeks summary judgment on Plaintiff's Title VII claims on the ground that the conditions precedent for filing a suit—lodging an EEOC charge and receiving a "right to sue" notice ("Notice")—were not met before Plaintiff filed this action. *See* Dkt. 89-6 at 8–9, 17–18. Plaintiff does not dispute that he failed to file his EEOC charge or receive his Notice before initiating this action, but he contends that "any alleged technical defect" was cured by his subsequent compliance with these requirements and the receipt of the Notice. *See* Dkt. 91 at 4.

Before a plaintiff may bring a civil action under Title VII, he must timely exhaust administrative remedies for "[e]ach discrete discriminatory act," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), typically by filing a charge with the EEOC within 180 days of the discriminatory act's occurrence, *see* 42 U.S.C. § 2000e-5(e)(1), and receiving a Notice prior to bringing suit, *see id.* § 2000e-5(f)(1). Here, GDIT is correct that Plaintiff initiated this action prematurely. Plaintiff was provided notice of his impending termination on July 19, 2023, and the incidents leading to Plaintiff's immediate removal occurred on July 20, 2023. *See* Dkt. 89-2 at 3 (Birnbaum Decl. ¶¶ 13, 15–16); Dkt. 91-1 at 52 (EEOC intake questionnaire indicating July 19, 2023, as "Date of Incident"). He filed his initial complaint in this action on October 2, 2023. *See* Dkt. 1. Plaintiff did not file his formal EEOC charge, however, until December 10, 2023, *see* Dkt. 89-3 at 318 (Charge of Discrimination signed December 10, 2023), which,

although timely within the statutory framework, *see* 42 U.S.C. § 2000e-5(e)(1), post-dates his initiation of this action. He received his Notice the next day. Dkt. 89-3 at 319 (Determination and Notice of Rights dated December 11, 2023).

For several reasons, however, the Court declines to dismiss Plaintiff's Title VII claims on the grounds of prematurity. First, Plaintiff filed his EEOC initial inquiry questionnaire on August 12, 2023, Dkt. 91-1 at 52, before initiating this action, *see Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 528 (D.C. Cir. 2019) (EEOC intake questionnaires "can be treated as part of the 'charge,' exhausting the claims described in it."). Second, Plaintiff received his Notice before GDIT filed its answer, *see* Dkt. 18 (dated January 16, 2024), and well before GDIT filed the pending motion for summary judgment, *see* Dkt. 89 (dated August 15, 2025), averting any possible prejudice to GDIT, *see Cruz-Packer v. District of Columbia*, 539 F. Supp. 2d 181, 190 (D.D.C. 2008) ("the defect of a prematurely filed [Title VII] lawsuit may be excused when it is cured by the issuance of a right[-]to[-]sue letter while the action is pending."); *Hunter v. WMATA*, No. 22-cv-3552, 2025 WL 522052, at *4 (D.D.C. Feb. 18, 2025) (collecting cases). Finally, Plaintiff is proceeding *pro se* and has endeavored to comply with the requirements for bringing suit.

The Court, accordingly, turns to the merits of Plaintiff's Title VII claims.

b.  Pay and Salary Discrimination Under Title VII (Counts I and IV)

Plaintiff brings two claims, "salary discrimination" and "pay discrimination," under Title VII. Dkt. 1 at 5–7 (Compl. ¶¶ 14–15, 35–36). At times, it appears that Plaintiff is challenging the failure to respond to his salary adjustment request and layoff shortly thereafter. *See, e.g.*, Dkt. 91 at 12 ("Plaintiff['s] pay discrimination claims rest mostly on the fact that his salary adjustment request was never denied or approved, he was just fired 48 hours after making the request, which indicates retaliatory actions from both Defendants."). At others, it appears that he

21

is challenging his allegedly disparate salary. *See id.* at 11 ("Plaintiff has alleged that despite performing the same or substantially similar work as peers, and despite being a [subject matter expert] placed in a highly specialized role requiring advanced technical and managerial skills, he was denied equitable pay." (citation omitted)). Throughout Plaintiff's briefing, he conflates these claims. *See, e.g.*, *id.* at 50–52 (Pl.'s Resp. to Def.'s SUMF ¶¶ 52–56) (discussing pay disparity and discriminatory retaliation interchangeably). Because the Court will consider separately the layoff and immediate access termination under a Title VII retaliation theory, the Court construes Plaintiff's salary and pay discrimination claims as challenging his allegedly disparate pay. *See Morris v. U.S. Dep't of Just.*, 298 F. Supp. 3d 187, 194–95 (D.D.C. 2018) (finding pay disparity actionable under Title VII); *see also Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 123 (D.D.C. 2023) (same); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 60 (D.D.C. 2004) (same).

Disparate pay claims are typically resolved under the familiar *McDonnell Douglas* burden-shifting framework, under which the plaintiff must first make out a *prima facie* case by showing that he is a member of a protected class; that he performed work substantially equal to that of a similarly situated employee; and that the fellow employee received compensation at a higher rate. *Perry v. Clinton*, 831 F. Supp. 2d 1, 12 n.7 (D.D.C. 2011) (citing *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999)). If the plaintiff can establish a *prima facie* case of pay or salary discrimination, the burden shifts to the employer "'to articulate some legitimate, nondiscriminatory reason' for the adverse employee action." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 181 (D.D.C. 2016) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). In proffering a legitimate, nondiscriminatory reason, the employer must offer more than a conclusory assertion that it did not act based on race or national

origin; it must "proffer admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *Figueroa*, 923 F.3d at 1092.

Once the employer has done so, and the matter is before the Court for summary judgment, the sole "central question" for the Court is whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non[]discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady*, 520 F.3d at 494. At this step, "[a] plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination . . . , by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Here, GDIT has proffered a legitimate nondiscriminatory reason for Plaintiff's starting salary. GDIT explains that "it is not unusual or uncommon for a people manager (such as Plaintiff) to be paid less than his or her direct reports, who are often employed in specialized IT/technical roles, and that Plaintiff's own manager, [] Basinger (who is Caucasian), has had direct reports who make more money than him due to the nature of their roles." Dkt. 89-6 at 11 (citing Def.'s SUMF ¶¶ 31–32, 52); Dkt. 89-4 at 2 (Basinger Decl. ¶ 11). For support, GDIT proffers evidence that "two of [Plaintiff's] direct reports [made] more than him" because they were "technical subject matter experts (SMEs)." Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 20). And it proffers evidence that among Plaintiff's "peers"—that is, "other individuals in the position of

23

Scrum Master Advisor reporting to [] Basinger"—"the highest paid person . . . was

Black/African American" and those "who earned more than [Plaintiff] had been in their positions

for considerably longer than" Plaintiff, who "had only been employed for approximately five

months at the time of his separation."  *Id.* at 4–5 (Birnbaum Decl. ¶ 21).

GDIT attaches an exhibit containing the following information regarding the four scrum

masters reporting to Basinger at the time that GDIT undertook its salary review:

| Title | Employee | 2022 Rating | Hire Date | Race | Annualized Salary Rate |
|---|---|---|---|---|---|
| [Scrum] Master Advisor | Nguedi | | 1/30/2023 | Black/African American | $140,000.00 |
| [Scrum] Master Advisor | 20021021 | Valued | 6/1/2021 | Asian | $144,942.00 |
| [Scrum] Master Advisor | 2009927 | Exceptional | 5/6/2019 | Black/African American | $157,299.82 |
| [Scrum] Master Sr. Advisor | 3123 | Valued | 6/7/2004 | White (Not Hispanic) | $156,145.43 |

Dkt. 89-2 at 24.  GDIT also proffers documentation that Plaintiff's immediate predecessor, a

white woman, had a salary of a little over $138,000 after almost 10 years in the role.  Dkt. 89-2

at 2 (Birnbaum Decl. ¶ 8); *id.* at 15 (showing predecessor's pay change history from July 1, 2012

to March 26, 2022).  More generally, GDIT explains that its salary determinations are based on

"numerous different factors . . . such as tenure and knowledge of the customer," *id.* at 4

(Birnbaum Decl. ¶ 20), and "based on what is supported by the rates in GDIT's contract with the

AO," Dkt. 89-4 at 2 (Basinger Decl. ¶ 11).

The Court concludes that GDIT's explanation, along with its evidence in the form of

declarations and comparator charts, is sufficiently clear and specific to establish a legitimate,

nondiscriminatory reason for Plaintiff's salary. *Figueroa*, 923 F.3d at 1092; *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII . . . does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions." (citation modified)). The only remaining question, then, is whether a reasonable jury could find that the proffered rationale was pretextual *and* that the actual reason that Plaintiff was paid less than some of his subordinates or peers was because of his race or national origin. Plaintiff bears that burden, and he has failed to show that a reasonable jury could make either finding.

Plaintiff claims in conclusory terms that he "has alleged that despite performing the same or substantially similar work as peers, and despite being a SME placed in a highly specialized role requiring advanced technical and managerial skills, . . . he was denied equitable pay." Dkt. 91 at 11 (citation omitted). He further asserts that he "has presented evidence that not only his compensation was more than $10,000 on average lower than his subordinates despite his managerial responsibilities, and received almost the lowest pay in the entire program despite being a manager, while receiving a salary that was $13,000 lower than his peers." *Id.* at 6. Having searched Plaintiff's evidentiary submissions, however, the Court is unable to find evidence regarding the pay of his subordinates or that he received "almost the lowest pay in the entire program" beyond statements in Plaintiff's unsworn pleadings and one conclusory statement in his deposition testimony. *See, e.g.*, Dkt. 89-3 at 22 (Nguedi Dep. 22:19–20) ("I have people in my staff making 180"). These generalized assertions—failing to identify any specific persons beyond his "subordinates" or "peers" who could serve as comparators, to identify their race or national origin, or to allege, even, why they are "similarly situated" comparators within the meaning of the statute—would likely not even establish a *prima facie* case, much less rebut GDIT's nondiscriminatory explanation. *Burley v. Nat'l Passenger Rail*

25

*Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (noting that the plaintiff bears the burden at summary judgment of "demonstrat[ing] that all of the relevant aspects of his employment situation were nearly identical to those of the other employee[s]" (citation modified)); *Singh*, 300 F. Supp. 2d at 60–61 (plaintiff's *prima facie* case failed at summary judgment despite providing several specific, named comparators and their starting salaries because comparators were not similarly situated); *Mosleh v. Howard Univ.*, No. 1:19-cv-0339, 2022 WL 898860, at *6–8 (D.D.C. Mar. 28, 2022) (granting summary judgment on Title VII pay discrimination claim for failure to establish *prima facie* case where plaintiff's specific, named comparators were not similarly situated).

But, even putting that difficulty aside, Plaintiff's argument still fails, because Plaintiff has failed to offer evidence countering GDIT's showing that the proper comparators, if any, are other Scrum Master Advisors reporting to Basinger, and not the technical SMEs that the Scrum Master Advisors facilitate. Plaintiff advances no evidence from which a reasonable jury could find that GDIT's explanation regarding the distinction between people managers and technical experts is pretextual besides asserting that "subordinates" making more than managers "is . . . not typical in any industry" and "completely atypical and reflect[ive of] discriminatory animus." Dkt. 91 at 6, 12. Plaintiff also contends that he was an "SME himself" and was "completing very technical duties," *id.* at 6; *see also id.* at 50 (Pl.'s Resp. to Def.'s SUMF ¶ 52), and points to his job description and resume, Dkt. 91-1 at 17–19, 47–49, but he offers no evidence to suggest that GDIT hired him for his subject matter expertise or as a SME; categorized and compensated other Scrum Master Advisors as SMEs or as technical roles instead of as "people managers;" or mischaracterized his job as a people manager role, *see id.* at 32 (onboarding email from Basinger noting that Plaintiff's "[r]oles and [r]esponsibilities" includes being a "Scrum Master" and

26

"GDIT People Manager"); *see also Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (a court "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." (citation modified)).

To be sure, the evidence that GDIT has itself proffered shows that Plaintiff was paid less or slightly less than his fellow Scrum Master Advisors. But all of his fellow Scrum Master Advisors worked for the company for longer than him. One comparator with eighteen months greater tenure received less than $5,000 more than Plaintiff, and the other two comparators had many more years with GDIT but received salaries that were only a little more than ten percent above Plaintiff's starting salary. Dkt. 89-2 at 24. Moreover, as noted above, the highest paid Scrum Master Advisor was also Black, while Plaintiff's white predecessor did not make his starting salary even at her departure after almost ten years in the role. *Id.* at 2, 4–5 (Birnbaum Decl. ¶¶ 8, 21); *id.* at 15, 24. He offers no evidence to show that any of these individuals received salary adjustments within five months of beginning their roles. Instead, he quibbles with GDIT's submissions, *see, e.g.*, Dkt. 91 at 12 ("Defendant has failed to provide any verifiable system generated paystub showing [predecessor's] name and a salary."), and, again, in the form of unsworn pleadings, states that "[w]hile Plaintiff's tenure was shorter than some peers, this does not justify the substantial pay disparity" and that his "advance qualifications" "exceed[ed] those of some higher-paid peers," *id.* at 51–52 (Pl.'s Resp. to Def.'s SUMF ¶ 55), without identifying which peers, the race or national origin of those peers, or how his qualifications exceeded those of those peers or offset their tenure or knowledge of the customer.

Against this backdrop, the Court concludes that no reasonable jury could find based on the record evidence that GDIT's stated reasons for setting Plaintiff's salary at the rate that it did were pretextual.

For similar reasons, the Court also concludes that no reasonable jury could find that GDIT's actual reason for setting Plaintiff's starting salary at that rate was based on his race or national origin, rather than other factors like "tenure and knowledge of the customer," Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 20).  Plaintiff merely asserts in conclusory terms and without citing any controverting evidence that "tenure or customer knowledge does not justify such a large discrepancy."  Dkt. 91 at 50 (Pl.'s Resp. to Def.'s SUMF ¶ 52).  But Plaintiff bears the burden of identifying evidence that would permit a reasonable jury to find that GDIT considered his race or national origin in setting his starting salary.  *See, e.g.*, *Mosleh*, 2022 WL 898860, at *6, 7 (granting summary judgment on pay discrimination claim when defendant explained that it "sets salary levels for its professors pursuant to a variety of considerations" including "pay increases because of [] administrative service" and plaintiff "advanced no facts to show that [defendant] considered [his] race or national origin in setting [his] salary.").  Plaintiff has not done so.

The Court will, accordingly, grant summary judgment in favor of GDIT on Counts I and IV.

      c.  <u>Race and National Origin Retaliation under Title VII, Section 1981, and the DCHRA (Counts V and VIII)</u>

Plaintiff also asserts claims for retaliation under Title VII, Section 1981, and the DCHRA.  Title VII "prohibits an employer from 'discriminat[ing] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (first alteration in original) (citing 42 U.S.C. § 2000e–3(a)).  The DCHRA provides that it is "an unlawful discriminatory practice to . . . retaliate against . . . any person . . . on account of having exercised or enjoyed . . . any right granted or protected under this chapter."  D.C. Code § 2–1402.61(a).

28

Courts apply the same standards for evaluating retaliation claims under Title VII and the

DCHRA. *See, e.g.*, *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *Howard Univ. v.*

*Green*, 652 A.2d 41, 45 (D.C. 1994). And although, for reasons discussed below, the Court

grants summary judgment to GDIT on Plaintiff's Equal Protection Clause (and/or Section 1983)

claim (Count II), it will consider Plaintiff's invocation of Section 1981 alongside Plaintiff's Title

VII and DCHRA retaliation claims, since "courts use the same general framework for evaluating

[S]ection 1981 and Title VII cases at the summary judgment stage." *Yazzie v. Nat'l Org. for*

*Women*, 712 F. Supp. 3d 56, 76 (D.D.C. 2024).

As with Plaintiff's disparate pay claims, the Court must evaluate his retaliation claims

under the *McDonnell Douglas* framework. *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir.

2007) (per curiam). The plaintiff must first establish a *prima facie* case by showing that "(1) []he

engaged in a statutorily protected activity; (2) []he suffered a materially adverse action by [his]

employer; and (3) a causal connection existed between the two." *Id.* Unlike a disparate

treatment claim, however, a plaintiff must demonstrate that "the desire to retaliate was the but-

for cause of the challenged employment action." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S.

338, 352 (2013); *Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024) (applying but-for causation to

Title VII retaliation claim). Once the employer has responded by identifying "legitimate reasons

for the allegedly . . . retaliatory actions and [has] proffered evidence in support of those reasons,"

the case proceeds to the "ultimate question of discrimination *vel non*." *Wiley*, 511 F.3d at 156

(citation modified).

"To recover under [Title VII's] opposition clause, the plaintiff must have been

discriminated against for opposing a practice 'made an unlawful employment practice by [Title

VII].'" *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)).

This threshold requirement is ordinarily satisfied when "an employee communicates to [his] employer a belief that the employer has engaged in a form of employment discrimination." *Crawford*, 555 U.S. at 276 (citation modified). Not all "opposition" is protected by Title VII (or Section 1981 or the DCHRA), however. To be sure, informal complaints—such as emails to management—may constitute protected activity. *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 202 (D.D.C. 2012). But "[n]ot every complaint garners its author protection." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition," *id.*, and it must be based on a reasonable, good faith belief that the practice at issue "was unlawful under the statute," *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) (citations omitted).

Here, GDIT has once again proffered legitimate nondiscriminatory reasons for Plaintiff's July 19 layoff, and his July 20 access removal and placement on administrative leave. As for the July 19 layoff, GDIT provides "contemporaneous documentation" of its proffered nondiscriminatory business reason, *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012), including an email from Pomroy, dated July 13, 2023, stating that Pomroy had "determined the JSPACE team no longer requires a full time scrum master" and asking GDIT to "transition [Plaintiff] off the contract" and to "backfill that position with a Business Analyst that shadows Kathryn and takes on some of her work," and "transition [Plaintiff's] day to day . . . responsibilities to Kiran." Dkt. 89-4 at 11. GDIT also proffers internal HR documentation prepared by GDIT employee Lisa Banks, dated July 18, 2023, documenting the "layoff request," stating that the reason for the request is a "[c]hange in [c]ustomer [r]equirements." Dkt. 91-1 at 34. That documentation reads as follows:

> [Plaintiff] supports Task Order 1 on the [JSPACE] effort on the ASO program. The customer informed GDIT via email on 7/13/2023 that a scrum master on

> TO1 is no longer needed and they want to convert it to a business analyst role instead.  The customer specifically stated in his email that he wants [Plaintiff] to transition off the contract ([Plaintiff] is the only scrum master on TO1).  A new position for Business Analyst will be opened[,] which requires a different skill set.

*Id.*  Finally, Plaintiff's layoff letter, dated July 19, 2023, corroborates this decision, informing Plaintiff:  "[Y]our position with [GDIT] has been impacted due to a change in customer requirements on Task Order 1 in support of the [JSPACE] effort on the . . . [AO] contract.  Should you not secure alternate employment within the company, you will be laid off effective August 4, 2023."  Dkt. 89-4 at 12; *see also id.* at 14 (Basinger emailing layoff notification to Plaintiff).

As for Plaintiff's subsequent removal from GDIT and AO systems and placement on administrative leave on July 20, 2023, GDIT provides contemporaneous documentation that it removed Plaintiff from the program and placed him on paid administrative leave at the AO's request, after he sent two "erratic" emails in which he accused the Federal Reserve of hacking into his email and deleting tabs from his work product, claimed that "shady forces connected to the fake jew and the fake federal reserve are trying to take control of the judiciary to use it against black people," and claimed that he was the "Second Coming of Jesus Christ,"  Dkt. 89-3 at 331–32; Dkt. 89-4 at 4 (Basinger Decl. ¶¶ 19–20); Dkt. 89-2 at 3 (Birnbaum Decl. ¶¶ 15–16); Dkt. 74-1 at 34.

This showing readily meets GDIT's burden of presenting legitimate nonretaliatory reasons for its employment actions.  As a result, the Court must once again consider whether Plaintiff has met his burden of proffering evidence sufficient to permit a reasonable jury to find that these reasons are pretextual *and* that the actual reason for GDIT's actions was retaliatory.  Considering the record as a whole, the Court concludes that no reasonable jury could find that either action was taken to retaliate against Plaintiff for requesting a salary adjustment or for

31

raising the specter of racial targeting in his two July 20 emails.  But even without that conclusion, Plaintiff's retaliation claims fail because he has failed to offer evidence that either his salary adjustment request(s) or his July 20 emails qualify as protected activities, and, thus, no reasonable juror could find that retaliation was the "but-for" cause of the adverse employment actions.  Either way, GDIT is entitled to judgment as a matter of law on Plaintiff's retaliation claims.

Plaintiff identifies two allegedly protected activities in support of his retaliation claims. Neither suffices.

*July Salary Adjustment Request*

The Court begins with Plaintiff's salary adjustment request in July 2023.  As the Court has previously explained, a salary increase or salary adjustment request, devoid of some concurrent reference to the plaintiff's protected status or complaint of the employer's unlawful discrimination, does not—standing alone—qualify as protected activity.  *Nguedi II*, Dkt. 58 at 5; *Nguedi III*, Dkt. 71 at 5; *contra Mansfield v. Billington*, 432 F. Supp. 2d 64, 73 and n.3 (D.D.C. 2006) (plaintiff's letter "claiming that she suffered from discriminatory pay and asking for a response within 10 business days" "is a protected activity under Title VII.").  Having now reviewed the record, the Court concludes that Plaintiff's July salary adjustment request was not protected activity within the meaning of the governing antidiscrimination statutes.  There is no evidence in the record that, when Plaintiff requested a salary adjustment at the July 2023 meeting, he simultaneously complained about or even insinuated that his asserted pay deficiency was the product of racial or national origin discrimination.  *See Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 188–89 (D.D.C. 2018), *aff'd*, 773 F. App'x 6 (D.C. Cir. 2019) (plaintiff's letter "requesting a salary increase commensurate with her secretarial duties" and

32

subsequent statements during meeting with supervisors were not Title VII-protected activity when she failed to mention or imply gender discrimination); *Harris v. Wackenhut Servs., Inc.*, 590 F. Supp. 2d 54, 78 (D.D.C. 2008), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) ("conference call" statements and "written proposal for increased compensation" for staff were not "protected activit[ies]" within the meaning of DCHRA anti-retaliation provision because evidence did not show that plaintiff's "complaints to management indicated a concern that racial discrimination was an underlying reason for the alleged compensation disparity."). There is simply no evidence that Plaintiff mentioned his race or national origin during the July 2023 meeting.

Plaintiff now asserts that he "explicitly raised his salary adjustment request and concerns regarding race discrimination" during the July 2023 meeting and that he "clearly stated that he believed he was being discriminated against." Dkt. 91 at 33 (Pl.'s Resp. to Def.'s SUMF ¶ 29), and that "on July 11, 2023, during a performance review meeting with Mr. Basinger, . . . he explicitly requested a salary adjustment and linked the disparity to his race," *id.* at 48 (Pl.'s Resp. to Def.'s SUMF ¶ 48). But he merely makes these assertions in his unsworn Response to Defendant's Statement of Undisputed Material Facts; he points to no evidence, testimony, or declarations to that effect.

Plaintiff contends that during that meeting, Basinger told him that he "would speak with the client and get back to Plaintiff in a few days" regarding his salary adjustment request, but this allegation too lacks any evidence in the record, even deposition testimony. *Id.* at 31 (Pl.'s Resp. to Def.'s SUMF ¶ 26). Plaintiff's own sworn testimony appears to confirm Basinger's version of the July meeting. When asked about his conversation with Basinger "for a pay increase in July," Dkt. 89-3 at 187 (Nguedi Dep. 187:7–8), Plaintiff testified that Basinger said "the policy is that every year there's an adjustment, so wait for next year," *id.* at 188 (Nguedi Dep. 187:8–10).

33

Plaintiff continued, "I was thinking in my mind, I'm not asking for—because I know every year there is a reassessment of someone's salary based on inflation and all of that. I'm thinking I'm in the wrong salary category," *Id.* (Nguedi Dep. 188:10–14). Most of Plaintiff's responses to Defendant's Statement of Undisputed Material Facts focus on the pay disparities between himself and his subordinates or "the misalignment between his compensation and his job responsibilities," with no reference to his race. *See, e.g.*, Dkt. 91 at 32 (Pl.'s Resp. to Def.'s SUMF ¶ 28). But a salary inquiry based on a belief that one is in the "wrong salary category" or not being compensated commensurate to his responsibilities is not, on its own, protected activity, because it does not oppose a practice made unlawful by Title VII.

Although Plaintiff has sought to file four different complaints at this point, he alleges for the first time in his opposition briefing and response to Defendant's Statement of Undisputed Material Facts that he "raised concerns about salary discrimination and unequal pay based on race upon joining GDIT in February or March 2023," *Id.* at 48 (Pl.'s Resp. to Def.'s SUMF ¶ 48). But "Plaintiff cannot substitute new allegations at the summary-judgment stage for those made in [his] complaint." *Mosleh*, 2022 WL 898860, at *7. Plaintiff's proposed third amended complaint, which as explained below, the Court will not grant Plaintiff leave to file, does not reference these February or March meetings or suggest that these prior requests were tied to his race. *Mason v. Geithner*, 811 F. Supp. 2d 128, 208 n.105 (D.D.C. 2011), *aff'd*, 492 F. App'x 122 (D.C. Cir. 2012) (rejecting new allegations of "protected activity" when plaintiff had "no less than four opportunities to set forth his claims in his pleadings").

Moreover, even if the Court were to allow such amendment-by-opposition, the record contains no evidence of any such February or March request. The only evidence in the record that the Court was able to find is Plaintiff's testimony that from "Day One" he told Basinger that

34

he "needed a salary adjustment," to which Basinger told him that they would "talk about it in a year" based on his performance.  *See* Dkt. 89-3 at 29 (Nguedi Dep. 29:18–23).  Plaintiff responded that "it's not about a salary adjustment based on inflation or something like that.  It's that I am in the wrong category or something."  *Id.* at 29–30 (Nguedi Dep. 29:24–30:2).  Just as with the July salary adjustment request, then, there is no evidence that any earlier salary adjustment requests made by Plaintiff were ever tied to his race.

*July 20 Emails*

That then leaves his July 20 emails.  The first email contains no protected activity.  It fails to mention any unlawful discrimination by GDIT or the AO.  Its only mention of race is the assertion that "shady forces [are] trying to take control of the judiciary to use it against black people."  Dkt. 89-3 at 331.  And, in any event, the first email was sent only to AO employees, not to Plaintiff's employer, GDIT.  *Id.*; Dkt. 74-1 at 34 (GDIT internal HR documentation noting the email was sent to "3 government people" who are the "customer").

As for the second email, which was sent to Basinger and Pomroy, the Court has concluded before that that email also fails to qualify as protected activity within the meaning of Title VII (or any other antidiscrimination statute).  *Nguedi III*, Dkt. 71 at 7–8 (email was not Title VII-protected activity because it "did not communicate[] to [his] employer a belief that *the employer* has engaged in a form of employment discrimination," (citation modified)).  Nothing has changed since the Court reached that conclusion.  The email does not identify the AO or GDIT as the culprit of the hacking or his racial targeting.  Instead, as Plaintiff's testimony reiterates, he believes the Federal Reserve was behind the deletion of the two tabs from his work product.  *See* Dkt. 89-3 at 104–05 (Nguedi Dep. 104:17–105:4) (noting that only the Federal Reserve could have infiltrated the attachment in his email and that the Federal Reserve has

35

attempted to kill him 17 times). His email further blames "the fake jew and the fake federal reserve" and repeatedly refers to "they" (without any indication of who "they" might be) as the source of his purported sabotage and targeting.[4] *Id.* at 332. Merely complaining to his managers that some federal entity or religious group—or fake federal entity or fake religious group— targeted him based on his race does not amount to protected activity.

Plaintiff contends that he engaged in protected activity because his email also states that an AO colleague told him that Plaintiff's work "is going to help guide us going forward" but GDIT told him during his layoff meeting that "'the client wants to move in a different direction' which is 100% inconsistent with what you can see in this video" and "this is why I believe that I'm being targeted because of my race." *Id.* But this argument suffers from two related problems. An employer cannot retaliate against an employee for protected activity unless it

---

[4] Plaintiff's deposition provided further clarity on what he means by the "fake jews" and the "fake federal reserve." Specifically, Plaintiff believes that "fake jews" are those who claim "that Moses saved them from Africa where they were building pyramids" and, because Plaintiff believes that "[i]t's not possible" for "any white person . . . [to] build pyramids in the desert" as "[o]nly Africans can do that," that "[a]ll the Jews are Africans." Dkt. 89-3 at 150 (Nguedi Dep. 150:7–20). He "call[s] them the fake Jews because the real Jews are the people of Sudan, Ethiopia, Somalia." *Id.* at 156 (Nguedi Dep. 156:1–3). "[T]he people who built the pyramids in Africa" are "the true . . . Jews and me, because I'm the Second Coming of course." *Id.* (Nguedi Dep. 156:3–7). Plaintiff further believes that "[t]he Jews that are at the Federal Reserve, they are fake first, . . . fake Jews, all of them." *Id.* at 149 (Nguedi Dep. 149:10–12). And he believes that "the Jews are going to be put in front" in "the whole white supremacy agenda." *Id.* at 114 (Nguedi Dep. 114:21–22).

As for the "fake federal reserve," it appears Plaintiff believes that the Federal Reserve is itself fake. When asked, "What do you mean by that, that term, 'fake Federal Reserve,'?" Plaintiff responded, "It's fake. The Federal Reserve is supposed to be a reserve of gold, silver, and bronze. If there is no gold, silver, or bronze, it's fake. It's just paper." *Id.* at 108 (Nguedi Dep. 108:14–20). Elsewhere, Plaintiff states that the "fake Federal Reserve," is "printing money out of thin air, infiltrating things to sabotage Black people," *id.* at 111 (Nguedi Dep. 111:9–12), and "putting incompetent people everywhere" such as "all of the Senators," *id.* at 112 (Nguedi Dep. 112:18–21).

knows that the employee has engaged in that activity. *See Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019) ("Common sense teaches that an employer cannot retaliate against conduct of which it was unaware."). It would not even arguably violate Title VII or any other antidiscrimination statute for GDIT to tell Plaintiff that the AO wanted to let him go so that it could "move in a different direction"—an explanation it has consistently proffered—while one of Plaintiff's colleagues from the AO tells him that his work will help them moving forward. The sentence that Plaintiff highlights, moreover, is immediately followed by the statement: "Some shady forces connected to the fake jew and fake federal reserve are trying to take control of the judiciary to use it against black people." Dkt. 89-3 at 332. Reading the email as a whole, no reasonable juror could find that GDIT was on notice that Plaintiff was complaining about *its* unlawful discrimination. *Harris v. Trs. of the Univ. of D.C.*, 567 F. Supp. 3d 131, 149 n.12 (D.D.C. 2021) ("A frustrated outburst to one's boss is not a protected activity, absent some connection to an attempt to vindicate rights under the statute.").

This conclusion is further bolstered by uncontroverted evidence showing that GDIT was unaware that Plaintiff was complaining about unlawful discrimination until Birnbaum spoke to him after he was removed from the program. *See* Dkt. 74-1 at 34 (noting complaint of discrimination only during Birnbaum's phone call); Dkt. 89-2 at 4 (Birnbaum Decl. ¶ 18) (stating that on a phone call after the July 20, 2023, access termination, "[Plaintiff] expressed confusion about why the customer would request his removal and suggested it was related to his race . . . . This was the first time that [Plaintiff] had ever complained to GDIT's HR about perceived race discrimination or unfair treatment.").

Even if it were possible to construe Plaintiff's second email as at least gesturing at some protected activity, Plaintiff has proffered no evidence that that activity, rather than his statements

accusing the Federal Reserve of hacking into his email and deleting his tabs, blaming the "fake jew and the fake federal reserve," and claiming to be the "Second Coming of Jesus Christ," Dkt. 89-3 at 332, was the "but-for" cause of his access removal and placement on administrative leave or that this explanation is pretextual. Although temporal proximity can, at times, support an inference of causation and may be used to rebut a legitimate nondiscriminatory reason proffered by the employer, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001), it does not help Plaintiff here, where GDIT's stated reason for removing Plaintiff was the "erratic" and unprotected content of the very emails in which Plaintiff claims to have engaged in protected activity, *see* Dkt. 89-4 at 4 (Basinger Decl. ¶ 19). Although "nothing in the language of the antiretaliation provision or its purpose permits an employer to take adverse action against an objecting employee merely because of the tone, intensity, or insistence of his objection," an employer's legitimate nondiscriminatory reason may be that "the employee's manner of objecting was so outside the bounds of reasonableness that the manner in which the employee made the complaint can be separated from the substance of the complaint itself." *Savignac v. Day*, 754 F. Supp. 3d 135, 200–01 (D.D.C. 2024). Plaintiff has failed to identify any evidence that GDIT's reaction to his email and its concomitant decision to terminate his access and to place him on paid administrative leave were "dishonest or unreasonable." *Brady*, 520 F.3d at 496.

Finally, even if the Court were to construe Plaintiff's second July 20 email as containing some protected activity, he has failed to supply any "positive evidence" of retaliatory motive or pretext "beyond mere proximity." *Hamilton*, 666 F.3d at 1359 (citation modified).

The Court will, accordingly, grant summary judgment in favor of GDIT on Counts V and VIII.

d.   Hostile Work Environment (Count I)

Although GDIT persuasively argues that Plaintiff has failed to exhaust his hostile work environment claim, Dkt. 89-6 at 9–10, the Court need not decide that issue because the claim, in any event, fails as a matter of law.  To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "In determining whether an actionable hostile work environment claim exists, [courts] look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Morgan*, 536 U.S. at 116 (citation modified).  "A plaintiff asserting a claim based on a hostile work environment faces a high hurdle."  *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016).

Because Plaintiff's salary determination, layoff, and immediate placement on administrative leave are alleged "[d]iscrete acts constituting discrimination or retaliation claims . . . different in kind from a hostile work environment claim," *id.* at 95 (citation modified), and the Court has already concluded that the record is devoid of evidence that these incidents were the product of discriminatory or retaliatory animus, the Court looks to Plaintiff's complaint and the EEOC inquiry questionnaire for other conduct that might possibly support Plaintiff's hostile work environment claim.  But even viewed through that liberal lens, the bases for Plaintiff's hostile work environment claim remain the very bases that the Court has already rejected as insufficient to state a claim.  *See Nguedi III*, Dkt. 71 at 6.  He asserts, for example,

that (1) he was asked to resubmit his passport for minor mistakes made during the HR process and that he was placed into a healthcare option that he did not want at first because he failed to make a benefits election within 31 days, Dkt. 1 at 2 (Compl. ¶¶ 4–5); Dkt. 91-1 at 11–16, 54; Dkt. 89-2 at 2–3 (Birnbaum Decl. ¶¶ 11–12); Dkt. 89-3 at 39 (Nguedi Dep. 39:12–23); (2) he was not allowed to control his own meetings, Dkt. 1 at 3 (Compl. ¶¶ 12–15); Dkt. 91-1 at 54; Dkt. 89-3 at 22, 25 (Nguedi Dep. 22:24–25, 25:14–16); and (3) he was asked to do nothing about two security breaches, one of which Plaintiff reported anyway, Dkt. 1 at 4 (Compl. ¶¶ 17–18), Dkt. 91-1 at 54.

Even at the motion-to-dismiss stage, these incidents would not suffice, and, at this more demanding stage of the proceeding, the Court has little difficulty concluding that no reasonable jury could find that two resolved incidents related to HR and benefits enrollment, a direction that Plaintiff refrain from reporting two security breaches, and an ongoing inability to control his own meetings give rise to the sort of severe and pervasive conduct required for a hostile work environment claim. *See Fields*, 207 F. Supp. 3d at 95 ("Cobbling together a number of distinct, disparate acts will not create a hostile work environment." (citation modified)); *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1173 (D.C. 2008) ("genuinely trivial occurrences will not establish a *prima facie* case" of a hostile work environment (emphasis added)). Nor is there any evidence that would permit a reasonable jury to find that any of these incidents were related to Plaintiff's race or national origin. *Nicola*, 947 A.2d at 1173 ("[I]t is critical that, in bringing a hostile work environment claim [under the DCHRA], the plaintiff establish *discriminatory* harassment." (emphasis in original)).

The Court will, accordingly, grant summary judgment to GDIT on Count I.

2.      *Equal Protection Clause and Section 1983 (Count II)*

GDIT is also entitled to judgment as a matter of law on Plaintiff's Equal Protection

Clause ("EPC") and Section 1983 claim.[5]  GDIT asserts that this claim fails because it is not a

state actor.  *See* Dkt. 89-6 at 14.  The Court agrees that the claim fails as a matter of law.

It is undisputed that GDIT is a private "non-governmental company."  Dkt. 89-2 at 1

(Birnbaum Decl. ¶ 4).  Plaintiff does not resist that premise and, instead, argues that GDIT is a

"private entit[y] performing governmental functions, or acting in close concert with government

agencies," and therefore "may be treated as [a] state actor[] under the Equal Protection Clause

and § 1983."  Dkt. 91 at 9.  Plaintiff points to a single piece of evidence to support his contention

that "GDIT was performing core governmental functions under the AO's authority," *id.*—a

single paragraph in the Birnbaum Declaration, which attests that GDIT placed Plaintiff on

administrative leave "[b]ased on the [AO's] directive," Dkt. 89-2 at 3 (Birnbaum Decl. ¶ 16).

But even if the act of placing Plaintiff on administrative leave "'may be fairly treated as that of

the [federal government] itself," *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531

U.S. 288, 295 (2001) (citation modified), the Court has already concluded that no reasonable jury

could find, based on the record evidence, that the decision to place Plaintiff on administrative

leave was the product of racial or national origin animus.  Moreover, putting aside the fact that

Section 1983 does not apply to federal actors, *see Ashcroft v. Iqbal*, 556 U.S. 662, 675–76 (2009)

(noting that Section 1983 applies to state officials), the same conclusion would apply even if

Section 1983 were otherwise applicable.

---

[5] Although Plaintiff captions the claim as one brought under "Section 1981," he also references
Section 1983 within the same Count, *see* Dkt. 1 at 6 (Compl. ¶ 28), and the Court has construed
any separate claim emerging from Section 1981 alongside Plaintiff's Title VII and DCHRA
claims.

The Court will, accordingly, grant summary judgment in favor of GDIT on Count II.

3.      *Contract Claims (Counts VI and VII)*

The Court next considers Plaintiff's contract-related claims.  The contours of these claims are far from clear.

To the extent that Plaintiff claims that his layoff and subsequent termination breached a contract he had with GDIT, the contract-related claims fail as a matter of law.  Under D.C. law, "employment is presumed to be at will, unless the contract of employment expressly provides otherwise."  *Carl v. Child.'s Hosp.*, 702 A.2d 159, 162 (D.C. 1997) (Terry, J., concurring).[6] Here, however, the Court need not rely on the presumption because the offer letter's express terms are emphatic that the position that Plaintiff was offered was "at will" and that the "company [did] not guarantee [Plaintiff's] employment for any specific period of time" and that "there is no written or unwritten agreement of employment between [Plaintiff] and the company."  Dkt. 89-3 at 321.  Plaintiff does not dispute that he was an at-will employee.  *See* Dkt. 91 at 23–24 (Pl.'s Resp. to Def.'s SUMF ¶¶ 8, 10) ("the offer letter contained an at-will disclaimer" and "GDIT characterizes the employment as 'at-will'").

An at-will employee may not bring a breach of contract or breach of implied covenant claim based on his termination or discharge.  *See Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 67 (D.D.C. 2005) ("Termination of employment, then, does not breach an at-will employment contract, because by its very terms the agreement contemplates that either party may end the employment relationship, with or without cause."); *Howard v. Fed. Express Corp.*,

---

[6] Neither Plaintiff nor GDIT raises a choice-of-law argument, and both presume D.C. law applies.  "Because litigants may waive choice-of-law issues, the Court need not challenge [the parties'] evident assumption that [D.C.] law applies."  *Parker v. John Moriarty & Assocs. of Va., LLC*, 332 F. Supp. 3d 220, 234 n.10 (D.D.C. 2018).

280 F. Supp. 3d 26, 30 (D.D.C. 2017) ("Absent the existence of a contract with [d]efendants,

Count IV—Howard's breach of duty of good faith and fair dealing claim—necessarily fails.");

*United States ex rel. Guo v. Nat'l Endowment for Democracy*, No. 18-cv-02986, 2022 WL

503765, at *15 (D.D.C. Feb. 18, 2022) ("The District 'does not recognize a claim for breach of

the implied covenant of good faith and fair dealing when brought by an at-will employee.'"

(quoting *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 (D.C. 1997)).

Notwithstanding this background, Plaintiff maintains that his employment was not

merely at-will.  He asserts:

> Contrary to GDIT's assertions, Plaintiff has consistently identified contractual terms and conditions that GDIT breached.  The offer letter and accompanying job description detailed the duties, compensation structure, performance expectations, and support Plaintiff would receive.  (See APPENDIXES #11, #12, #15)[.]   Taken together, these writings constituted more than mere "guidelines" or "aspirations"; they formed the essential terms of the parties' agreement, which GDIT reinforced through its subsequent conduct.  Plaintiff relied on these terms in leaving other opportunities and committing to work for GDIT and the [AO].   That reliance and mutual assent created enforceable contractual obligations that GDIT cannot evade by relying solely on boilerplate "at-will" disclaimers.

Dkt. 91 at 14; *see also id.* at 16 ("The evidence demonstrates that GDIT undertook explicit

obligations and assurances through the offer letter, job description, and course of dealing,

creating reasonable expectations regarding pay, responsibilities, support, and performance

conditions.  Plaintiff relied on these representations in accepting employment and performing his

duties.").  That argument, however, is squarely foreclosed by Plaintiff's offer letter, which

expressly disclaims any implied contract: "[T]here is no written or unwritten agreement of

employment between [Plaintiff] and the company," and "[n]o oral representation shall supersede

this offer letter."  Dkt. 89-3 at 321.

The Court cannot disregard the unambiguous terms of the offer letter.  *See Patel v. Ambit

Grp.*, No. 18-cv-2985, 2019 WL 4472124, at *3 (D.D.C. Sept. 17, 2019), *aff'd*, No. 19-5283,

43

2020 WL 1918354 (D.C. Cir. Apr. 2, 2020). But even if the Court were to look past this (insurmountable) hurdle, Plaintiff still fails to identify a single provision or sentence in the offer letter or job description or to provide any specific examples from the parties' course of dealing or GDIT's "subsequent conduct," Dkt. 91 at 14, that might arguably have created a contractual obligation. Nor can the Court discern from Plaintiff's conclusory allegations what duties GDIT purportedly failed to perform, what performance expectations it failed to meet, or what support GDIT failed to offer Plaintiff.

Plaintiff also argues that his allegedly disparate pay breached some contractual undertaking. He contends, for example, that GDIT "failed to compensate [him] on an equal and non[]discriminatory basis despite assurances that pay and benefits would be competitive and merit-based." *Id.* at 15. Plaintiff cites to a page from GDIT's policy manual that states that it will provide "competitive [and] equitable" pay based on "merit, skill, experience, and other work[-]related criteria without regard to race, color, . . . national origin, . . . or any other protected class under relevant federal, state[,] and local laws," and that it would "not discharge or in any other manner discriminate against employees or applicants" based on a salary-related inquiry. Dkt. 91-1 at 8. But nothing in that alleged policy, even if given contractual status, promises that new hires will receive a salary adjustment within five months of beginning employment. Nor does the policy overcome the undisputed fact that Plaintiff expressly accepted GDIT's salary offer of $140,000. Dkt. 91 at 22, 24 (Pl.'s Resp. to Def.'s SUMF ¶¶ 6, 9). That was the parties' contractual agreement, and no resort to a general policy regarding pay equity can overcome the parties' express agreement.

Plaintiff's contract-related claims also fail to the extent that they duplicate his pay discrimination, retaliation, and hostile work environment claims, which the Court has already

concluded do not survive summary judgment, *see, e.g.*, Dkt. 91 at 23–24 (Pl.'s Resp. to Def.'s SUMF ¶ 8) ("[w]hile the offer letter contained an at-will disclaimer, such language does not and cannot permit employer to engage in unlawful discrimination, retaliation, or wrongful termination in violation of federal and state law."); *id.* at 15 ("pay disparities, pay discrimination and retaliatory conduct directly supports [the covenant of good faith and fair dealing] claim.") . *See Carter v. George Washington Univ.*, 387 F.3d 872, 883–84  (D.C. Cir. 2004) (breach of contract claim based on "personnel manual creat[ing] a contract requiring [defendant] to abide by federal antidiscrimination laws" failed because plaintiff failed to identify relevant portions of the manual that created a contract and the "claim cannot survive summary judgment because she cannot show illegal discrimination in the first place."); *see also Boyd v. O'Neill*, 273 F. Supp. 2d 92, 96 (D.D.C. 2003) (Title VII does not preclude common law claims where plaintiff "alleges a harm *apart from* discrimination" and seek to "remedy that distinct injury." (emphasis added)).

The only aspect of Plaintiff's claim for breach of contract that remains, then, is his claim that he was "prevent[ed] . . . from submitting his final timesheets," that he was not "paid for his last week of work," and that "GDIT continues to falsely claim that Plaintiff was paid through August 4, 2023."  Dkt. 91 at 15; *see also id.* at 44, 55 (Pl.'s Resp. to Def.'s SUMF ¶¶ 42, 63). Unsurprisingly, "an employee's at-will status does not prevent him from recovering for compensation owed to him for work performed during his period of employment."  *Daisley*, 372 F. Supp. 2d at 71.  Plaintiff does not, however, proffer any evidence that could create a triable issue of fact on this issue.  Without any evidentiary support, Plaintiff merely asserts (in an unsworn filing) that the "only payment he received was a check delivered via FedEx two days after his removal, which did not fully compensate him for the period of administrative leave or

unused vacation." Dkt. 91 at 55 (Pl.'s Resp. to Def.'s SUMF ¶ 63). But he offers no evidence to counter GDIT's explanation and paystub documentation, showing that his final paycheck—which his own emails admit that he received, Dkt. 89-2 at 30–31—included both his unused vacation time and regular pay for only one, rather than two weeks, based on the pay period, *id.* at 25–28. Plaintiff's vague contention that "these numbers don't add up," *id.* at 29, without any calculations or explanation of the deficit, any evidence in the form of previous paystubs or cashed checks, and no reason to doubt the veracity of GDIT's evidentiary submissions of his paystub, does not survive summary judgment on a breach of contract claim.

GDIT is, accordingly, entitled to judgment as a matter of law on Counts VI and VII.

4.      *Intentional Infliction of Emotional Distress (Count III)*

Finally, the Court addresses Plaintiff's intentional infliction of emotional distress ("IIED") claim. GDIT argues that this claim is preempted by the Workers' Compensation Act ("WCA"), by Title VII, and, in any event, fails as a matter of law. Dkt. 89-6 at 15–17. Because GDIT's second two arguments are both clear-cut and dispositive, the Court need not reach the company's WCA preemption argument.

To start, the Court is persuaded that the Plaintiff's IIED claim is subsumed by his discrimination and retaliation claims. "[T]he outrageous behavior that Plaintiff claims caused [his] emotional distress consists entirely of Defendant's allegedly discriminatory and retaliatory actions," and is accordingly, "subsumed within those claims." *Arias v. Marriott Int'l, Inc.*, No. 15-cv-1258, 2019 WL 1440117, at *9 (D.D.C. Mar. 31, 2019). Plaintiff's IIED claim alleges that GDIT acted with "reckless disregard for Plaintiff's wellbeing by targeting him for retaliation after he engaged in protected activity, abruptly cutting him off from work systems to damage his livelihood, and engaging in a campaign to isolate, mock[,] and discredit him," and that GDIT engaged in "systemic retaliation, abrupt deprivation of access, deliberate reputational harm, and

46

reckless disregard for the consequences to his livelihood." Dkt. 91 at 10–11. It follows that any resulting "emotional distress derives completely from [his] claims for" discrimination, retaliation, and hostile work environment, and are subsumed into those claims. *Arias*, 2019 WL 1440117, at *9; *see also Boyd*, 273 F. Supp. 2d at 96 (common law tort claims are not precluded by Title VII if they seek to remedy a harm "*apart from* discrimination" (emphasis added)).

Nor does Plaintiff identify evidence sufficient to permit a reasonable jury to find that GDIT's conduct was "extreme and outrageous." *See Wood v. Neuman*, 979 A.2d 64, 77 (D.C. 2009) (extreme and outrageous conduct requires "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (citation modified)). In general, "employer-employee conflicts do not rise to the level of outrageous conduct." *Carson v. Sim*, 778 F. Supp. 2d 85, 96 (D.D.C. 2011) (quoting *Duncan v. Child.'s Nat'l Med. Ctr.*, 702 A.2d 207, 211–12 (D.C. 1997)); *Kerrigan*, 705 A.2d at 628. Here, moreover, the Court has already concluded that no reasonable jury could find, based on the record evidence, that GDIT laid off Plaintiff or removed him from AO systems or placed him on administrative leave because of his race or because he had engaged in protected activity. *See Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 373 (D.C. 2003) (conduct justified by "legitimate business reasons" are "acts [that] certainly do not amount to 'outrageous conduct' for the purpose of establishing [IIED].").

Plaintiff invokes three exhibits in support of his IIED claim. The first is an email that Basinger sent to Birnbaum on July 20, 2023, after Plaintiff had sent the two emails and after he had been removed from the program, forwarding a message from Pomroy, in which Pomroy asserts, "Shocked this guy passed the background check." Dkt. 91-1 at 1. Pomroy attached two links to his message, one containing an article from BlackNews.com, reporting that Plaintiff had

47

accused the New York Police Department of breaking into his apartment, injecting him with drugs, and then almost beating him to death, "all while claiming they were trying to help," *Black IT Consultant Leaves His Job, Creates Powerful Mental Technology That Helps Veterans With PTSD*, BlackNews.com (Nov. 5, 2021), https://perma.cc/3CV3-9C2K, and one containing a decision from a case that Plaintiff brought against the Federal Reserve Bank of New York, alleging—by "[e]mploying unsupported and anti-Semitic speculation," and other "colorful . . . allegations"—that the Bank had discriminated against him when, among other things, it terminated him after he had brought a taser into the building, *Nguedi*, 2019 WL 1083966, at *1, 3–4. The second exhibit is GDIT's HR documentation of the incident involving Plaintiff's two July 20 emails, in which GDIT HR noted that Basinger called Plaintiff's claim that "his files were manipulated and sabotaged" "crazy talk." Dkt. 91-1 at 4. And the third exhibit is simply a GDIT investigative document indicating that Basinger had "no concerns with [Plaintiff's] performance or conduct" while he worked "on the program." *Id.* at 7.

No reasonable jury could find based on these exhibits, or any other evidence in the record, that GDIT engaged in "extreme and outrageous conduct" that "intentionally or recklessly" caused Plaintiff "severe emotional distress." *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008). To satisfy this test, the challenged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (citation modified). Here, however, the first exhibit that Plaintiff invokes merely takes note of a concern expressed by a representative of GDIT's client. Although the second exhibit uses an unfortunate turn of phrase, it was a purely internal document that reflected a legitimate concern. And the third merely notes that Plaintiff had

48

performed his duties as required before GDIT's client concluded that it no longer needed a scrum master on the project.  None of this comes close to meeting the high bar for alleging, much less proving, a claim for IIED.

The Court will, accordingly, grant summary judgment in favor of GDIT on Count III.

**B.    Motions for Reconsideration, Leave to Amend, and Leave to File a Supplemental Brief**

The Court turns to Plaintiff's motions for reconsideration, leave to amend, and leave to file a supplemental brief.  As an initial matter, the Court construes Plaintiff's Motion for Leave to File a Supplemental Brief, Dkt. 92, as a fourth Motion for Reconsideration and Leave to Amend.  Defendant GDIT and the AO, for their part, oppose reconsideration and leave to amend, arguing that Plaintiff's motion fails to meet the high burden for seeking reconsideration and that leave to amend should be denied due to undue delay and prejudice.  *See generally* Dkts. 76 & 81. The AO also opposes amendment on the grounds that the amended complaint would be futile. Dkt. 81 at 8–9; Dkt. 94 at 1.

Plaintiff's motion to reconsider this Court's denial of his prior motion for leave to amend, *Nguedi III*, Dkt. 71, fails because it raises no "(1) . . . intervening change in the law; (2) . . . discovery of new evidence not previously available; or (3) . . . clear error in the first order."  *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008) (citation modified) .  To start, Plaintiff seeks to relitigate the joint-employer status of the AO, Dkt. 74 at 2; Dkt. 78 at 2; Dkt. 92-1 at 2, 4–9 (Part II ¶¶ 1, 5–8, 13; Part III ¶¶ 2, 4, 7, 10), but that issue was not one of the six *independent* bases on which the Court denied leave to amend.  He also seeks to relitigate the dismissal of his hostile work environment claim, Dkt. 74 at 3–4; Dkt. 92-1 at 5 (Part II ¶ 9), but the Court has now dismissed that claim on the merits for the same reasons the Court first identified in *Nguedi III*, Dkt. 71 at 6.  And Plaintiff seeks to relitigate the dismissal of his

49

retaliation claims based on the legal conclusion that his July 20 email was not protected activity. Dkt. 74 at 3–4; Dkt. 92-1 at 2–4, 6, 9 (Part II ¶¶ 2–3, 6, 11–12; Part III ¶ 8).  But, despite the Court's decision to deny Plaintiff leave to amend to add that theory of retaliation, the Court has now considered the theory as part of Plaintiff's retaliation claim against GDIT and has concluded that the theory fails on the merits for the same reasons it outlined in *Nguedi III*, Dkt. 71 at 7–8. In addition to these arguments, Plaintiff maintains that the Court "Misapprehended Key Facts Surrounding Plaintiff's Salary Adjustment Request," Dkt. 74 at 5, because it made a reference to the "*denial* of his request for a raise," *Nguedi III*, Dkt. 71 at 5 (emphasis added), instead of using Plaintiff's preferred characterization of GDIT's response as "fail[ure] to respond" and "remov[al]," Dkt. 74 at 5; Dkt. 78 at 2.  That is a distinction without a difference, however, in light of the Court's conclusion then and now that his salary adjustment request does not qualify as protected activity.  *Nguedi III*, Dkt. 71 at 5.

No change in law, clear error, or new evidence warrants revisiting any of these prior determinations, which the Court has revisited and reaffirmed in light of not just Plaintiff's allegations, but also his evidence.  The fact that Plaintiff "simply disagree[s] with the Court's analysis and conclusions" does not "carry [Plaintiff's] heavy burden of showing that reconsideration is warranted." *Abulhawa v. U.S. Dep't of Treasury*, No. 15-cv-2186, 2017 WL 2465045, at *2 (D.D.C. June 7, 2017).  Plaintiff has had more than ample opportunity to present all of his theories and arguments to the Court and, as a matter of the just and efficient resolution of pending litigation, *see* Fed. R. Civ. P. 1, the process of argument and re-argument must come to an end.

Plaintiff's motions for leave to file a third amended complaint must be denied for similar reasons.  Plaintiff filed his motion to amend after the Court had set a briefing schedule for

summary judgment as to Plaintiff's claims against GDIT and after the Court had already concluded that "permitting the amendment at this late date would cause GDIT substantial prejudice" because "discovery is closed" and "reopen[ing] discovery" would delay the summary judgment briefing, which, at the time, was still a little over two months away. *See Nguedi III*, Dkt. 71 at 8. The Court further concluded that "renew[ing] [Plaintiff's] claims against the [AO]" "would likely invite substantial delay" to accommodate new discovery and new motion-to-dismiss briefing from the AO. *Id.* Plaintiff offers no reason why the Court should arrive at a different conclusion about substantial prejudice and undue delay now. This alone is grounds to deny the motion. *Atchinson v. District of Columbia*, 73 F.3d 418, 427 (D.C. Cir. 1996) (futility need not be considered when the court finds undue delay and prejudice).

But for all the reasons explained in this opinion, permitting Plaintiff to file a third amended complaint would be futile. This proposed complaint, as far as the Court is able to discern, adds a paragraph on his joint employment theory, Dkt. 74-1 at 2–3 (Third Am. Compl. ¶ 10), a paragraph restating the legal standard for hostile work environment, *id.* at 3 (Third Am. Compl. ¶ 11), and now, for the first time, alleges that on July 11, 2023, "Plaintiff politely reminded Mr. [Basinger] who was already aware of the situation, *that as a black manager*, he has been underpaid even compared to his subordinates," *id.* at 4 (Third Am. Compl. ¶ 18) (emphasis added). "[Plaintiff] offer[s] no reason for failing to assert these claims earlier in this action, although [he] had known the facts," including in his three prior complaints. *Howard v. Pritzker*, 775 F.3d 430, 446 (D.C. Cir. 2015) (citation modified); *N. Am. Cath. Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice, PLLC*, 887 F. Supp. 2d 78, 87 (D.D.C. 2012) (finding prejudice, delay, and dilatory motive where "plaintiffs have been in

possession of the facts supporting these new claims"). These new allegations do not, in any event, cure the several deficiencies identified by the Court in Plaintiff's prior complaints.

In light of Plaintiff's *pro se* status, the Court has considered the allegations that Plaintiff seeks to add against GDIT as part of its consideration of GDIT's motion for summary judgment and, for present purposes, simply notes that none of the *evidence in the record*—as opposed to unsupported assertions in Plaintiff's pleadings—offers any support Plaintiff's most recent allegations. The Court has considered, for example, both Plaintiff's July 11 salary adjustment request (which he alleges was accompanied by a reference to his race for the first time in his third amended complaint) and his July 20 emails (which were not in his operative complaint) as possible protected activities for the purpose of his retaliation claims. The Court has also considered the evidence or exhibits that Plaintiff has submitted as part of each of his prior attempted amendments or motions for reconsideration as part of the submitted record in adjudicating summary judgment. But even when considered through this exceedingly liberal lens, Plaintiff's claims remain unsupported.

The thrust of Plaintiff's motions is to bring the AO—which has not been a defendant in the case for over a year—back into the case. Repeated motions for reconsideration and leave to amend for the sole purpose of adding the AO back into an ongoing litigation against GDIT would prejudice GDIT, which has waited patiently to resolve this matter, and are not the proper vehicle to express dissatisfaction with this Court's rulings or to seek redress from the AO.

The Court will, accordingly, deny Plaintiff's Motion for Reconsideration and Leave to File an Amended Complaint, Dkt. 74, and Plaintiff's Motion for Leave to File a Supplemental Brief, Dkt. 92, with prejudice.

52

C.      **Motion for Relief from Further Vexatious Filings**

Finally, the Court addresses GDIT's and the AO's request for a court order pursuant to Federal Rule of Civil Procedure 1, requiring Plaintiff to seek leave of the Court to file any further motions "attempting to amend his complaint," Dkt. 76 at 5, or attempting "to add or reinstate claims against the [AO]," Dkt. 80 at 10.  The AO also requests an order "reliev[ing] the [AO] of the need to respond to further filings by [Plaintiff] unless the Court specifically directs it to do so."  *Id.* at 11.

It is "well settled that a court may employ injunctive remedies to protect the integrity of the courts and the orderly and expeditious administration of justice."  *Urban v. United Nations*, 768 F.2d 1497, 1500 (D.C. Cir. 1985) (per curiam).  "Those remedies can include, in appropriate cases, pre-filing injunctions that restrict a litigant's ability to file certain actions without prior leave of the court."  *Klayman v. Porter*, 104 F.4th 298, 306 (D.C. Cir. 2024).  Such restrictions, however, are "a tool of last resort," and should be "reserved for those rare and egregious cases in which the 'frivolous or harassing nature' of a litigant's actions threatens the 'administration of justice' or the 'integrity of the courts[,]'" *id.* (citing *In re Powell*, 851 F.2d 427, 430–31 (D.C. Cir. 1988) (per curiam)).  Such restrictions must also be narrowly tailored to avoid "unduly impair[ing] a litigant's constitutional right of access to the courts."  *In Re Powell*, 851 F.2d at 430.  Before entering a prefiling injunction, the Court must: (1) provide notice to the affected party, (2) consider the "number and content" of the filings, and (3) "make substantive findings as to the frivolous or harassing nature of the litigant's actions."  *Id.* at 431.

Although the AO contends that the three-part standard is met here, the Court is not persuaded that the prefiling injunction standard is applicable.  The type of remedy proposed by GDIT and the AO in this case—an order requiring leave to file any further motions seeking reconsideration or leave to amend or an order relieving the AO from responding—Dkt. 76 at 5;

53

Dkt. 80 at 10–13—is far less restrictive than the prefiling injunctions at issue in *Powell* and

similar cases. *See Urban*, 768 F.2d at 1500 (requiring leave of court before filing any civil

action in any federal court of the United States); *Smith v. Scalia*, 44 F. Supp. 3d 28, 48 (D.D.C.

2014) (restricting plaintiff from "filing new actions in the U.S. District Court for the District of

Columbia unless he is either represented by a licensed attorney admitted to practice in this court

or requests and receives permission from the court to proceed *pro se*" (emphasis added)).

Indeed, the inapplicability of the *Powell* three-part test to a less restrictive remedy is highlighted

by the fact that the D.C. Circuit has instructed courts to consider whether "less draconian

sanctions [than pre-filing injunctions] [are] []available or would . . . work" before issuing a

prefiling injunction. *Klayman*, 104 F.4th at 307; *id.* at 309 (suggesting district courts employ

"other tools available to them to address repetitive and unduly burdensome litigation").

Here, it is within the Court's discretion to issue a narrow order directing Plaintiff to

refrain from filing further repetitive motions of the type at issue. *See* Min. Order (Nov. 27,

2024), *Neal v. Yellen*, No. 24-cv-1895 (D.D.C. Nov. 27, 2024) ("In light of the fact that [*pro se*]

[p]laintiff has already filed two motions for reconsideration, he is directed not to file another.");

*Benyamini v. Johnson*, No. 07-cv-907, ECF No. 46 at 2 (E.D. Cal. Mar. 8, 2011) (after three

motions to reconsider, one motion for leave to amend, and one motion to reconsider denial of

leave to amend by *pro se* plaintiff, "No further motions for reconsideration will be accepted.");

*Pina v. Tilton*, 3:07-cv-4989, ECF. No. 37 at 1 (N.D. Cal. July 6, 2009) (after two motions

seeking to vacate or relitigate prior judgment partially dismissing *pro se* plaintiff's claims, two

motions for leave to file amended complaints, and one motion to reconsider court's denial of

leave to amend, "No further motions for reconsideration will be considered regarding the denial

of leave to amend."); *Lin v. Univ. of Nebraska*, No. 4:05-cv-3153, ECF No. 137 at 1 (D. Neb.

54

Oct. 23, 2006) (after considering two motions to reconsider from *pro se* plaintiff, "No further motions for reconsideration will be entertained by the court, plaintiff may appeal the court's Judgment.").

The Court has considered three motions for reconsideration, three motions for leave to amend, a supplemental brief construed as a fourth motion for reconsideration and/or for leave to amend, all of which seek to relitigate this Court's prior dismissal of the claims against the AO and this Court's determination that Plaintiff's allegations do not state Title VII claims. In other circumstances, this record would likely suffice to grant GDIT and the AO the type of limited relief that they seek. But the circumstances have changed, since the Court has now granted summary judgment in favor of GDIT and will promptly enter final judgment. At this point, it seems unlikely that Plaintiff will renew his request to amend his complaint or will seek to relitigate any of the motions that the Court resolved months ago; rather, to the extent Plaintiff disagrees with the Court's rulings, he can now file an appeal, and he can raise his objections to the Court's decisions in that context. If, instead, Plaintiff continues to relitigate matters in this Court, the Court can—at that time—consider whether some limitation on his ability to file further pleadings, or an order relieving the AO of its obligation to respond to Plaintiff's further motions unless ordered to do so by Court, is warranted.[7]

---

[7] *Cf. Amissah v. Gallaudet Univ.*, No. 19-679, 2019 WL 13277397, at *7 (D.D.C. Dec. 23, 2019) (ordering that defendant "need not respond" to purported claims in a *pro se* litigant's amended complaint that lacked factual allegations supporting a coherent legal theory); *Alston v. Cap. One Bank (USA), N.A.*, No. 20-3795, 2021 WL 7208901, at *2 (D.D.C. Oct. 27, 2021) (granting plaintiff leave to file second amended complaint but stating defendants "need not respond" to the complaint unless ordered by the Court); Min. Order (June 3, 2025), *Alter v. Trump*, No. 25-0480 (D.D.C. June 3, 2025) (granting *pro se* plaintiff leave to file but stating "defendant need not respond unless ordered to do so by the Court."); *Lopez v. Cate*, No. 10-cv-1773, ECF. No. 128 at 3 (E.D. Cal. Jul. 21, 2014) (after Plaintiff filed three motions for sanctions, "pursuant to the Court's inherent authority to manage its docket, [d]efendants are relieved of any further obligation to respond to motions for sanctions filed by [p]laintiff, absent a court order.").

Plaintiff has had ample opportunity to take discovery and to develop and to support his case. The Court has thoroughly considered each of Plaintiff's claims, his legal arguments, and the evidentiary record as a whole, and, in doing so, it has taken account of Plaintiff's status as a *pro se* litigant. And, now, the Court has explained its reasons for concluding that, based on the evidentiary record developed by the parties, Plaintiff's claims fail as a matter of law. To the extent Plaintiff disagrees, he may, of course, file an appeal. At this point, however, there is nothing left for this Court to do.

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT** GDIT's Motion for Summary Judgment, Dkt. 89; will **DENY** Plaintiff's Motion for Reconsideration and Leave to File a Third Amended Complaint, Dkt. 74; will **DENY** Plaintiff's Motion for Leave to File a Supplemental Brief, Dkt. 92; will **DENY** GDIT's request to preclude Plaintiff from filing further motions to amend his complaint or to reinstate the AO as a defendant, Dkt. 76 at 5; and will **DENY** the AO's Motion for Relief from Further Vexatious Filings, Dkt. 80.

A separate order will issue.

/s/ Randolph D. Moss<br>RANDOLPH D. MOSS<br>United States District Judge

Date:  March 31, 2026

57